# EXHIBIT C

# EXHIBIT 6



**Confidential**

**ZIE 805**

## LICENSE AGREEMENT

This "Agreement" is made this 13th day of September, 1996 by and between ZIEBART INTERNATIONAL CORPORATION, a Michigan corporation, ("LICENSOR") and Z TECHNOLOGIES CORPORATION, a Delaware corporation ("LICENSEE").

### RECITALS

A.    LICENSOR is (i) engaged in licensing, pursuant to written license agreements, the use of its distinctive Ziebart name and other registered trademarks and service marks and distinctive processes for performing protective services to motor vehicles including the installation of accessory products, application of protective coatings, detailing services and (ii) uses its distinctive Ziebart name and other registered trademarks, tradenames and service marks and distinctive formulas and manufacturing processes in the production and sale of chemicals and coatings to its licensees and to the original equipment manufacturing automotive and related markets.

B.    LICENSOR has offered to sell and LICENSEE has agreed to purchase, subject to the terms and conditions set forth in a separate agreement, certain assets relating to LICENSOR'S chemical and coating manufacturing operation (Ziebart Products Group, Inc., a wholly owned subsidiary of Licensor) including real estate, fixtures, equipment, formulas, the know how for the manufacture and customer lists.

C.    LICENSEE desires to be licensed by LICENSOR in the use of the trademarks (as defined below) for the sale of certain chemicals and coatings in the original equipment manufacturing automotive market and to DESIGNATED END USERS as defined below ("License").

D.    As part of the obligations of this License, LICENSEE agrees to pay LICENSOR a royalty.

NOW THEREFORE in consideration of the premises and the mutual covenants in the AGREEMENT set forth below, the parties agree as follows:

## I.    DEFINITIONS.

1.    "LICENSED GOODS" means any and all chemicals or products manufactured by LICENSEE its subsidiaries, divisions and affiliates now or in the future.

2.    "APPROVED MATERIAL" means materials in connection with which the TRADEMARKS are used which comply with the customer specifications and meet the approval of the customer's purchase order.

**Confidential**                                                    **ZIE 806**

3.   (a)  "CONSOLIDATED GROSS SALES" means the total consideration charged or received by LICENSEE and its subsidiaries, divisions and affiliates, whether in cash, credit or exchange of services for value, in a bona fide arm's length transaction consummated or intended to be consummated by transfer of title in any of the LICENSED GOODS <u>less</u> returns actually credited and shipping charges actually charged to customer, but no deductions shall be made for any other costs incurred including but not limited to costs of manufacture, sales or distribution of the LICENSED GOODS.

(b)  With respect to any LICENSED GOODS used, sold or otherwise disposed of by LICENSEE in other than an arms length transaction, "GROSS SALES" shall include the average per unit sales price at which the most nearly similar LICENSED GOOD is sold in sales qualifying under paragraph 3(a) above or, if no such reference is available, the fair market value of the LICENSED GOODS as determined in accordance with LICENSEES's regularly established accounting and pricing practices for the most nearly related good to the LICENSED GOODS not embodying the TRADEMARKS and sold in accordance with paragraph 3(a) above.

4.   "TRADEMARKS" means the trademarks, service marks and tradenames attached hereto as Exhibit A used in any format, style or design as applied to the LICENSED GOODS, together with any modification of said trademarks, service marks and tradenames implimented by LICENSOR during the term of this Agreement or any renewals thereof.

5.   "LICENSED TERRITORY" means the United States of America and Canada.  LICENSEE shall not allow any trademark goods or any product covered by the Supply Agreement between the parties from being sold or resold for use outside the LICENSED TERRITORY.

6.   "DESIGNATED END USERS" means non-automotive commercial customers whose business and/or services are not in direct competition with the business and services of Ziebart and Ziebart TidyCar franchise system and who have been approved, in writing, which will not be unreasonably withheld or delayed by Ziebart.

II.   LICENSE

1.   LICENSOR hereby grants to LICENSEE the nonexclusive use of the TRADEMARKS upon or in connection with the LICENSED GOODS but only to the extent that the LICENSED GOODS are to be used, sold or otherwise provided to original equipment manufacturing automotive customers and DESIGNATED END USERS in the LICENSED TERRITORY.

2.   LICENSOR expressly prohibits the use of TRADEMARKS on or in connection with LICENSED GOODS sold to customers outside the LICENSED TERRITORY, or which are to be used, sold or otherwise

2

**Confidential**

**ZIE 807**

provided to retail sales customers for direct use or application or wholesale sales to customers in competition with any of the products and services provided by Ziebart and Ziebart Tidy Car Franchise systems, or in any corporate name.

3.    The LICENSE is nonassignable and nonsublicensable, except to LICENSEE'S affiliated companies upon written approval of LICENSOR. LICENSOR'S approval hereunder shall not be unreasonably withheld or delayed.

4.    No other right or license is granted by LICENSOR to LICENSEE or by LICENSEE to LICENSOR, either express or implied, with respect to any other trademark, trade name, service mark or other intellectual property owned or licensed by or to LICENSOR. LICENSEE shall not use the TRADEMARKS in any manner not specifically authorized by this AGREEMENT.

5.    <u>Initial Fee</u>.  The LICENSEE shall pay to LICENSOR an initial LICENSE fee of One ($1.00) Dollar to be paid upon the execution of this AGREEMENT.

6.    <u>Sales Performance Standard</u>.  At any time after the second annual period of the initial term of this AGREEMENT, LICENSOR shall have the right, at LICENSOR'S sole discretion, to terminate this AGREEMENT if LICENSEE shall fail to achieve the following minimum CONSOLIDATED GROSS SALES increases;

> <u>2nd year</u> - Two Million ($2,000,000) Dollars CONSOLIDATED GROSS SALES increase over LICENSEE'S base year CONSOLIDATED GROSS SALES;
>
> <u>3rd year</u> - Four Million ($4,000,000) Dollars CONSOLIDATED GROSS SALES increase over LICENSEE'S base year CONSOLIDATED GROSS SALES;
>
> <u>4th year</u> - Six Million ($6,000,000) Dollars CONSOLIDATED GROSS SALES increase over LICENSEE'S base year CONSOLIDATED GROSS SALES;
>
> <u>5th year</u> - Eight Million ($8,000,000)Dollars CONSOLIDATED GROSS SALES increase over LICENSEE'S base year CONSOLIDATED GROSS SALES;

For the purpose of this AGREEMENT LICENSEE'S base year CONSOLIDATED GROSS SALES shall be determined by adding the TOTAL GROSS SALES for OEM Products of Ziebart Products Group, Inc. for the fiscal year 1995 to the LICENSEE'S total CONSOLIDATED GROSS SALES for LICENSEE'S fiscal year ending 1995 and adjusted annually by the percent increase in the Consumer Price Index agreed upon by the parties on or before the closing date of the Asset Purchase Agreement dated August _22_, 1996 between LICENSOR and LICENSEE.

3

**Confidential**

**ZIE 808**

## III. ROYALTIES

1.    LICENSEE agrees to pay LICENSOR a royalty of five (5%) percent of the CONSOLIDATED GROSS SALES over the base year CONSOLIDATED GROSS SALES each annual period during the term of this AGREEMENT, which royalty payments shall be paid to LICENSOR quarterly.

The parties shall determine adjustments between annual royalties paid and annual royalties actually due within thirty (30) days of LICENSEE'S year end. Any payments or reimbursements of royalties shall be made within forty-five (45) days of LICENSEE'S year end. Any royalty payments or reimbursements of royalty payments not paid within five (5) days of the due date shall be subject to a late charge of five (5%) percent and shall accrue interest at the rate of eighteen (18%) percent per annum until paid in full.

2.    Notwithstanding any term or condition of this AGREEMENT to the contrary, while the initial term of this AGREEMENT is in effect, LICENSEE shall be obligated to make to LICENSOR minimum annual royalty payments in the amount set forth below:

    Year 1 - $37,500

    Year 2 - $75,000

    Year 3 - $150,000

    Year 4 - $225,000

    Year 5 - $300,000

The above-stated minimum annual royalty payments shall not be subject to adjustment, unless agreed to in writing by both LICENSEE and LICENSOR.

3.    Reporting of Royalties and Audit.

(a) LICENSEE shall provide LICENSOR with quarterly reports of CONSOLIDATED GROSS SALES, together with copies of:

(i) Quarterly internal CONSOLIDATED GROSS SALES Report which shall be submitted within thirty (30) days of the end of the LICENSEE'S quarter;

(ii) Annual internal CONSOLIDATED GROSS SALES Report which shall be submitted within thirty (30) days of the end of the LICENSEE'S year;

4

**Confidential**

**ZIE 809**

(iii)    Annual CONSOLIDATED GROSS SALES Report attested by an independent C.P.A. within ninety (90) days of LICENSEE'S year end.

(b)  Upon reasonable notice and during normal business hours, LICENSOR'S representative shall be entitled to enter upon, inspect and audit books and records relating to the sale of LICENSED GOODS of LICENSEE'S business and any other business owned or controlled by LICENSEE, including but not limited to books, records, facilities, materials and other matters related to LICENSEE'S obligation to pay royalties hereunder or to the usage of TRADEMARKS on such location where books, records or operations may be located.  LICENSOR shall not unreasonably interfere with the business activities of LICENSEE while conducting the audit.  LICENSEE agrees to cooperate with LICENSOR in the conduct of the audit.  In the event that an audit of LICENSEE'S operation reveals that all sales subject to royalty have not been reported in the time provided in this AGREEMENT, then LICENSEE shall pay to LICENSOR a surcharge of five (5%) percent of the amount of the royalties on unreported sales as shown by the accounting records of LICENSEE, or as reasonably estimated by LICENSOR based upon other evidence and eighteen (18%) percent per annum on amounts unreported until paid in full.  In the event that the sales are understated by five (5%) percent or more, the LICENSEE shall pay for the cost of the audit.  The surcharge and audit fee shall be paid by LICENSEE to LICENSOR in addition to such royalty.

IV.   TERM

1.   The Initial Term of this AGREEMENT shall end December 31, 2000.

At any time during the final year of the Initial Term of this AGREEMENT, LICENSEE shall have the option of renewal of this AGREEMENT for an additional five (5) year period ("First Renewal Term") on the same terms and conditions provided that:

(a)  LICENSEE is not in default under the material terms of this AGREEMENT;

(b)  LICENSEE'S CONSOLIDATED GROSS SALES increase exceeds Eight Million ($8,000,000) Dollars over LICENSEE'S base year's CONSOLIDATED GROSS SALES.

(c)  LICENSEE gives written notice of intent to exercise this option not less than thirty (30) days before the expiration of the initial term of this AGREEMENT.

5

**Confidential**                                                    **ZIE 810**

At any time during the final year of the First Renewal Term, LICENSEE shall have the option to renew this AGREEMENT for an additional ten (10) year period ("Second Renewal Term") on the same terms and conditions provided that:

(a)   LICENSEE is not in default under the material terms of this AGREEMENT;

(b)   LICENSEE'S CONSOLIDATED GROSS SALES increase exceeds Twelve Million ($12,000,000) Dollars over LICENSEE'S base year CONSOLIDATED GROSS SALES;

(c)   LICENSEE pays a renewal fee of fifty thousand ($50,000) dollars;

(d)   LICENSEE gives written notice of intent to exercise the option not less than thirty (30) days before the expiration of the First Renewal Term.

At any time during the final year of the Second Renewal Term, LICENSEE shall have the option to renew this AGREEMENT for an additional ten (10) year period ("Third Renewal Term") on the same terms and conditions provided that:

(a)   LICENSEE is not in default under the material terms of this AGREEMENT;

(b)   LICENSEE'S CONSOLIDATED GROSS SALES increase exceeds Sixteen Million ($16,000,000) Dollars over LICENSEE'S base year CONSOLIDATED GROSS SALES;

(c)   LICENSEE pays a renewal fee of fifty thousand ($50,000) dollars;

(d)   LICENSEE gives written notice of intent to exercise the option not less than thirty (30) days before the expiration of the Second Renewal Term.

## V.   QUALITY CONTROL AND RECORD RETENTION

1.   Any LICENSED GOODS used, sold or provided by LICENSEE that are connected with LICENSOR'S TRADEMARKS must be APPROVED MATERIAL.

2.   In the event that LICENSOR in its sole discretion determines that the LICENSED GOODS do not comply with the requirement of the previous paragraph, LICENSOR shall so notify LICENSEE and shall identify with reasonable specificity the LICENSED GOODS.  LICENSEE shall not sell or otherwise provide any LICENSED GOODS to customers until such time as LICENSOR notifies LICENSEE that the LICENSED GOODS are in compliance.

6

**Confidential**

3.    LICENSEE shall maintain during the term of this AGREEMENT and for three years thereafter, all customer specifications for LICENSED GOODS connected with LICENSOR'S TRADEMARKS.    LICENSEE shall immediately notify LICENSOR of each customer complaint regarding LICENSED GOODS connected with LICENSOR'S trademarks and provide LICENSOR access to all documentation and information LICENSEE deems necessary to determine the validity of such customer complaint, however, LICENSOR shall maintain LICENSEE'S customer confidentiality requirements regarding any such documentation and/or information disclosed by LICENSEE to LICENSOR hereunder.

## VI.  MARKING

1.    LICENSEE shall use the TRADEMARKS in such form as LICENSOR shall, in its sole discretion, approve in writing, on each item of promotional material and on each of the LICENSED GOODS. LICENSEE shall, in each case, use symbol ® and the written designation "under license from Ziebart International Corporation". LICENSEE shall not otherwise affix or use such in connection with nor use any other TRADEMARK in connection with the LICENSED GOODS without LICENSOR's prior written approval, which will not be unreasonably withheld or deserved.

2.    LICENSEE shall, within thirty (30) days after the execution of this AGREEMENT and prior to the use of new material and at least annually thereafter (and at more frequent intervals, if requested), submit to LICENSOR one sample each of any and all MATERIALS REQUIRING APPROVAL. Any such submission for approval, if not disapproved of within thirty (30) days after receipt, shall be deemed approved.

## VII. TRADEMARK RIGHTS AND WARRANTY

1.    At the request of LICENSOR, and upon reasonable compensation to LICENSEE, LICENSEE shall promptly do such acts and execute, acknowledge, and deliver all such papers as may be reasonably necessary or desirable, in the sole discretion of LICENSOR, to obtain, maintain, protect, and/or vest in LICENSOR the entire right, title, and interest in and to any TRADEMARK, including rendering such assistance as LICENSOR may request in any litigation, Patent and Trademark Office proceeding, or other proceeding.

2.    All use of any TRADEMARK licensed in this AGREEMENT and used on any LICENSED GOODS by LICENSEE shall inure to the benefit and be the property of LICENSOR.

3.    LICENSEE shall not contest LICENSOR's ownership of the TRADEMARKS or LICENSEE'S obligation to assign any rights hereunder including any rights LICENSEE may create in the TRADEMARKS. LICENSEE shall not contest or impair these rights, either directly

7

**Confidential**                                                      **ZIE 812**

or indirectly, or in any way assist others to contest or impair, unless as required by the law, the same and hereby expressly acknowledges LICENSOR's superior rights. This obligation shall survive any termination of this AGREEMENT.

4. LICENSOR represents and warrants that (a) it believes that the use by the LICENSEE of the TRADEMARKS in accordance with this AGREEMENT will not infringe the TRADEMARK rights of any third party; (b) it believes that there are no third parties infringing on the TRADEMARKS; (c) the TRADEMARKS are in continuous use; (d) it has all right, title, in and to the TRADEMARKS and the right to license the TRADEMARKS, to enter into this AGREEMENT, and to agree to the terms and conditions of this AGREEMENT.

5. In the event the LICENSEE shall become aware of any infringement by any third party of any right licensed under this AGREEMENT or any other use of the TRADEMARKS or any term confusing similar thereto, it shall promptly notify LICENSOR in writing of such infringement or use, and shall do such acts and assist and supply such information as is reasonably necessary, or desirable in relation thereto. LICENSOR shall take only those steps which, in its sole discretion, are necessary to enforce its rights, including the engagement of legal counsel of its own choosing.

## VIII. INDEMNIFICATION

LICENSEE shall indemnify, hold harmless, and defend (and pay any and all other expenses and reasonable attorney's fees, in connection therewith) LICENSOR and its officers, directors, agents, and employees, from and against any and all liability, loss, claims, and/or actions arising out of:

(a) any alleged unauthorized use of any patent, TRADEMARK, design, or copyright (except as to any right licensed hereunder) by LICENSEE;

(b) any alleged libel or slander against, or invasion of, the right of privacy or publicity or any other similar right of any third party (except as to any right licensed hereunder);

(c) subject to Paragraph VII(4), any alleged defect in any LICENSED GOOD despite LICENSOR's approval thereof, and any claim by a third party resulting from LICENSEE's act or omission;

(d) any alleged claim brought pursuant to any federal, state or local environmental laws, regulations or ordinances or common law environmental matters resulting from LICENSEE'S use of LICENSOR'S TRADEMARKS, tradenames and formulas.

8

**Confidential**

**ZIE 813**

LICENSOR shall indemnify, hold harmless, and defend (and pay any and all other expenses and reasonable attorney's fees, in connection therewith) LICENSEE and its officers, directors, agents, and employees, from and against any and all liability, loss, claims, and/or actions arising out of:

(a)  the inaccuracy or breach of any representation or warranty of the LICENSOR contained in this AGREEMENT;

(b)  any alleged claim brought pursuant to any federal, state or local laws, regulations or ordinances or common law relating to infringement of the TRADEMARKS resulting from LICENSEE'S use of the TRADEMARKS in accordance with this AGREEMENT.

## X.   TERMINATION

1.   In the event either LICENSEE or LICENSOR fails to perform any non-monetary obligation under this AGREEMENT, the other party (LICENSEE or LICENSOR) may terminate this AGREEMENT upon sixty (60) days prior written notice, provided, however, that the non-performing party shall not have remedied such failure within such sixty-day (60) period.

2.   LICENSEE may terminate this AGREEMENT without cause at any time upon sixty (60) days written notice to LICENSOR and payment of the remaining royalty payment due LICENSOR for the annual period in which termination becomes effective.

3.   LICENSOR may, in its sole discretion, terminate all or part of this AGREEMENT in the event that:

(a)  LICENSEE at any time fails to continue active marketing and distribution of the LICENSED GOODS.  Such termination shall not extinguish LICENSEE's obligation to pay royalties due during the current annual period, but shall extinguish the royalty for any additional annual period remaining during the TERM;

(b)  LICENSEE files a petition in bankruptcy or is adjudged bankrupt, or if a petition in bankruptcy is filed against LICENSEE, or if LICENSEE becomes insolvent, or makes an assignment for the benefit of creditors, or if LICENSEE discontinues its business, or if a receiver is appointed for LICENSEE or LICENSEE's business, which is not discharged within thirty (30) days.  Moreover, upon the occurrence of any of the events described above in this subparagraph 2(b):

(i)  No creditor, agent, representative, receiver, or trustee of LICENSEE shall have the right to dispose of

9

ZIE 814

any of the LICENSED GOODS without the prior written consent of LICENSOR.

(ii) Until payment of all monies due to LICENSOR from LICENSEE, LICENSOR shall have a lien: (A) on any of the LICENSED GOODS not then disposed of by LICENSEE; and (B) on any monies due LICENSEE from any third party, in respect to sales of LICENSED GOODS.

(c) LICENSEE remains delinquent on payment of any royalties due LICENSOR hereunder after thirty (30) days written notice from LICENSOR;

(d) LICENSEE assigns, sells or divests any portion of its current business operations which assignment sale or divesture;

(i) affects the amount of royalty payment to LICENSOR by greater than fifteen (15%) percent per annum;

(ii) affects a change in ownership of LICENSEE of greater than Twenty-Five (25%) percent of the initial ownership.

(e) Any material inaccuracy or numerous inaccuracies in accounting of the CONSOLIDATED GROSS SALES of LICENSEE.

(f) LICENSEE'S improper displays of TRADEMARKS or using the same in any unauthorized manner.

(g) LICENSEE'S refusal to make business records and books available to Ziebart, or its authorized representatives for audit purposes.

4.   Upon the expiration of this AGREEMENT or any earlier termination of this AGREEMENT:

(a) All rights granted to LICENSEE hereunder shall automatically revert to LICENSOR and LICENSEE shall execute any and all documents evidencing such automatic reversion;

(b) LICENSEE shall, in LICENSOR's discretion, either deliver to LICENSOR all patterns, proofs, and any other material, which reproduce the TRADEMARKS or give to LICENSOR satisfactory proof of the destruction thereof;

(c) LICENSEE shall, within three (3) months after such expiration or termination, deliver to LICENSOR a complete and accurate statement indicating the number, description, and whereabouts of all LICENSED GOODS on hand and/or in the

10

**Confidential**                                                 **ZIE 815**

process of manufacture, as of both the date of such expiration or termination and the date of such statement;

(d)  LICENSOR shall have the right, upon reasonable notice and during normal business hours, to enter onto LICENSEE's premises and/or the premises of any subcontractor of LICENSEE, to the extent that LICENSEE has the right to grant such entry, to conduct physical inventories to verify the accuracy of the above-described statement.

(e)  Upon termination of this AGREEMENT, LICENSEE may sell existing inventories of LICENSED GOODS (including LICENSED GOODS on order) on a nonexclusive basis in accordance with a plan of inventory liquidation approved by LICENSOR.

## XI.  GENERAL CONDITIONS

1.   Any notice or statement by any party shall be deemed to be sufficiently given when sent by prepaid first class mail to:

LICENSOR                                    LICENSEE

Ziebart International Corporation    Z Technologies Corporation
1290 E. Maple Road                      237 Mill Street
P.O. Box 1290                             Darby, Pennsylvania 19023
Troy, Michigan 48007-1290
Attn:  Thomas E. Wolfe, CEO          Attn:  Ellis L. Breskman, Ph.D
                                                  President

Copy to:                                    Copy to:

May, Simpson & Strote                  Pepper, Hamilton & Scheetz
P.O. Box 541                               Suite 400
100 West Long Lake Rd.                1235 Westlakes Drive
Bloomfield Hills, MI 48303-0541     Berwyn, PA 19312-2401
Attn:  Thomas C. Simpson, Esq.     Attn:  A. John May, III, Esq.

These addresses shall remain in effect until another address is substituted by written notice.

2.   This AGREEMENT shall be construed and governed solely by the laws of the State of Michigan.  The parties agree to the sole and exclusive jurisdiction of the proper Federal or State court for Oakland County.

3.   No amendment or modification of this AGREEMENT shall be valid or binding unless the same shall be made in writing and signed on behalf of each party by their respective proper officers duly authorized to do so.

11

**Confidential**                                                    **ZIE 816**

4.   (a)   The failure to enforce any of the terms and conditions of this AGREEMENT by either of the parties hereto shall not be deemed a waiver of any other right or privilege under this AGREEMENT or a waiver of the right to thereafter claim damages for any deficiencies resulting from any misrepresentation, breach of warranty, or nonfulfillment of any obligation of any other party to this AGREEMENT.

(b)   In order for there to be a waiver of any term or condition of this AGREEMENT, such waiver must be in writing and signed by the party making such waiver.

5.   In any action brought by a party hereto under this AGREEMENT, the prevailing party shall be entitled to recover its reasonable attorney's fees, costs, and expenses of suit.

6.   This AGREEMENT may be signed in two or more counterparts, each of which shall be an original.

7.   Headings.   The headings in this AGREEMENT are for convenience of reference only and shall not affect its interpretation.

8.   Gender.   Words of gender may be read as masculine, feminine, or neuter, as required by context.

9.   Number.   Words of number may be read as singular or plural, as required by context.

10.   Severability.   If any provision of this AGREEMENT is held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability will not affect any other provision hereof.   This Agreement shall, in such circumstances, be deemed modified to the extent necessary to render enforceable the provisions hereof.

11.   Entire Agreement.   This AGREEMENT constitutes the entire understanding among the Parties with respect to the subject matter contained herein and supersedes any prior understandings and agreements among them respecting such subject matter.

12.   Waiver.   The failure of any Party to insist upon strict performance of any of the terms or conditions of this AGREEMENT will not constitute a waiver of any of its rights hereunder.

ZIEBART INTERNATIONAL CORPORATION   Z TECHNOLOGIES CORPORATION

By: _____          By: _____

Its: PRESIDENT                        Its: PRESIDENT

12

**Confidential**                                    **ZIE 817**