# EXHIBIT A

ASSET PURCHASE AGREEMENT

BY AND AMONG

THE SENTRY CORPORATION

ZIEBART PRODUCTS GROUP, INC.

AND

ZIEBART INTERNATIONAL CORPORATION

## TABLE OF CONTENTS

**ARTICLE 1** . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
**Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . .   1
         1.1.  Defined Terms . . . . . . . . . . . . . . . .   1

**ARTICLE 2** . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
**Sale and Purchase of Assets** . . . . . . . . . . . . . . . . . .   5
         2.1.  Assets to be Acquired . . . . . . . . . . . .   5
         2.2.  Excluded Assets. . . . . . . . . . . . . . .   6
         2.3.  Closing Schedule . . . . . . . . . . . . . .   7
         2.4.  Conveyance . . . . . . . . . . . . . . . . .   7

**ARTICLE 3** . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
**Purchase Price and Payment** . . . . . . . . . . . . . . . . . .   7
         3.1.  Initial Purchase Price . . . . . . . . . . .   7
         3.2.  Adjustments to Purchase Price. . . . . . . .   7
         3.2.1 Adjustments on Closing Date. . . . . . . .   7
         3.3.  Payment of Purchase Price . . . . . . . . .   8
         3.4.  Allocation of Purchase Price . . . . . . . .   8

**ARTICLE 4** . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
**Liabilities of Seller** . . . . . . . . . . . . . . . . . . . .   9
         4.1.  No Assumption . . . . . . . . . . . . . . .   9

**ARTICLE 5** . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
**Representations and Warranties** . . . . . . . . . . . . . . . .   10
         5.1.  Representations and Warranties of Seller and
             Ziebart. . . . . . . . . . . . . . . . . . .   10
         5.1.1  Corporate Existence. . . . . . . . . . . .   10
         5.1.2  Corporate Power; Authorization. . . . . .   10
         5.1.3  Validity. . . . . . . . . . . . . . . . .   10
         5.1.4  No Third Party Options. . . . . . . . . .   11
         5.1.5  Title. . . . . . . . . . . . . . . . . . .   11
         5.1.6  Financial Statements. . . . . . . . . . .   11
         5.1.7  Inventory. . . . . . . . . . . . . . . . .   12
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
         5.1.8  Tangible Assets. . . . . . . . . . . . . .   12
         5.1.9  Suits. . . . . . . . . . . . . . . . . . .   12
         5.1.10  Insurance. . . . . . . . . . . . . . . .   13
         5.1.11  Intellectual Property. . . . . . . . . .   13
         5.1.12  Labor Contracts. . . . . . . . . . . . .   13
     5.1.13  Contracts and Commitments. . . . . . . . . .   13
         5.1.14  Environmental Matters. . . . . . . . . .   14
         5.1.15  Facility. . . . . . . . . . . . . . . . .   15
     5.1.16  Restrictions. . . . . . . . . . . . . . . .   17

-i-

5.1.17   Conditions Affecting Seller.  . . . . . . .   17
5.1.18   Notes.  . . . . . . . . . . . . . . . .   18
5.1.19   Complete Disclosure.  . . . . . . . . . .   19
5.2.    Representations and Warranties of Buyer . . .   19
5.2.1   Corporate Existence.  . . . . . . . . . .   19
5.2.2   Validity.  . . . . . . . . . . . . . . .   19
5.2.3   Authorization.  . . . . . . . . . . . . .   19

ARTICLE 6 . . . . . . . . . . . . . . . . . . . . .   20
   Agreements Pending Closing . . . . . . . . . . . .   20
       6.1.    General Covenants of Seller . . . . . .   20
              6.2.    Operation of Business . . . . . .   20
       6.2.11  Update Schedules.  . . . . . . . . . .   21
       6.3.    Access to Information . . . . . . . . .   21
       Environmental Audits  . . . . . . . . . . . .   22

ARTICLE 7 . . . . . . . . . . . . . . . . . . . . .   22
   Conditions Precedent to the Closing . . . . . . . .   22
       7.1.    Obligation of Buyer to Close . . . . . .   22
              7.1.1  No Adverse Change . . . . . .   22
       7.1.2   Insurance; Financing.  . . . . . . . .   22
       7.1.3   Environmental.  . . . . . . . . . . .   23
       7.1.4   Representations.  . . . . . . . . . .   23
   7.1.5  Covenants.  . . . . . . . . . . . . . . .   23
       7.1.6   Closing Certificate.  . . . . . . . .   24
   7.1.7  Opinion of Seller's Counsel.  . . . . . . .   24
       7.1.8   Required Information.  . . . . . . . .   24
       7.1.9   Closing Agreements.  . . . . . . . . .   24
       7.1.10  No Loss.  . . . . . . . . . . . . . .   24
       7.2.    Obligation of Seller to Close . . . . .   24
       7.2.1   Representations.  . . . . . . . . . .   24
       7.2.2   Covenants.  . . . . . . . . . . . . .   25

ARTICLE 8 . . . . . . . . . . . . . . . . . . . . .   25
   Indemnification . . . . . . . . . . . . . . . . .   25
       8.1.    By Seller and Ziebart.  . . . . . . .   25
       8.2.    Set-Off . . . . . . . . . . . . . . .   25
       8.3.    By Buyer  . . . . . . . . . . . . . .   26
       8.4.    Notice  . . . . . . . . . . . . . . .   26
   8.5.   Payment.  . . . . . . . . . . . . . . . .   27
   8.6.   Compliance with Bulk Sales Laws.  . . . . .   27
       8.7.    Other Rights and Remedies Not Affected. . .   27

ARTICLE 9 . . . . . . . . . . . . . . . . . . . . .   28
       Survival of Representations, Warranties,
              Guarantees, and Covenants . . . . . . .   28

ARTICLE 10 . . . . . . . . . . . . . . . . . . . .   28

The Closing . . . . . . . . . . . . . . . . . . . . . 28
        10.1.   Time and Place . . . . . . . . . . . . 28
        10.2.   Conduct of Closing . . . . . . . . . . 28

ARTICLE 11 . . . . . . . . . . . . . . . . . . . . . . 30
    Conduct of Seller and Buyer after Closing . . . . . 30
        11.1.   Continuation of Operations; Further
                Cooperation . . . . . . . . . . . . . 30
    11.2.   Non-Solicitation. . . . . . . . . . . . . . 31
    11.3.   Discharge of Business Obligations. . . . . 31
            11.4.   Maintenance of Books and Records. . . 31
    11.5.   Payments Received. . . . . . . . . . . . . 32
    11.6.   Use of Name. . . . . . . . . . . . . . . . 32
    11.7.   UCC Matters. . . . . . . . . . . . . . . . 33
    11.8.   Seller's Covenant Not to Compete. . . . . 33
    Buyer's Covenant Not to Compete . . . . . . . . . . 33

ARTICLE 12 . . . . . . . . . . . . . . . . . . . . . . 33
    Brokerage; Expenses . . . . . . . . . . . . . . . . 33

ARTICLE 13 . . . . . . . . . . . . . . . . . . . . . . 34
    Taxes . . . . . . . . . . . . . . . . . . . . . . . 34

ARTICLE 14 . . . . . . . . . . . . . . . . . . . . . . 34
    General . . . . . . . . . . . . . . . . . . . . . . 34
        14.1.   Entire Agreement . . . . . . . . . . . 34
        14.2.   Headings . . . . . . . . . . . . . . . 35
        14.3.   Gender . . . . . . . . . . . . . . . . 35
        14.4.   Number . . . . . . . . . . . . . . . . 35
        14.5.   Exhibits and Schedules . . . . . . . . 35
        14.6.   Severability . . . . . . . . . . . . . 35
        14.7.   Notices . . . . . . . . . . . . . . . 35
        14.8.   Counterparts . . . . . . . . . . . . . 36
        14.9.   Waiver . . . . . . . . . . . . . . . . 36
        14.10.  Further Actions and Assurances . . . . 36
        14.11.  Successors and Assigns . . . . . . . . 36
        14.12.  Governing Law . . . . . . . . . . . . 36
        14.13.  Amendments and Termination . . . . . . 37

## EXHIBITS

| | |
|---|---|
| A | Assignment and Assumption Agreement |
| B | Bill of Sale |
| C | Financial Statements |
| D | License Agreement |
| E | Non-Competition Agreement |
| F | Patent Assignment |
| G | Supply Agreement |
| H | Note |
| I | Guaranty |
| J | Opinion of Seller's Counsel |
| K | Stock Pledge and Security Agreement |
| L | Escrow Agreement |
| M | Warehousing Agreement |
| N | Administrative Services Agreement |

## SCHEDULES

| | |
|---|---|
| 2.1. | Acquired Assets |
| 3.4. | Allocation Schedule |
| 5.1.9. | Seller's Litigation |
| 5.1.10. | Seller's Insurance Policies |
| 5.1.13. | Contracts and Commitments |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated as of August 22, 1996, by and between Ziebart Products Group, Inc., a Michigan corporation ("Seller"), Ziebart International Corporation, a Michigan corporation and Seller's parent ("Ziebart"), and The Sentry Corporation, a Delaware corporation ("Buyer") (collectively, the "Parties").

In consideration of the premises and the mutual promises, covenants, representations, warranties, and guarantees herein contained, and intending to be legally bound, the Parties hereto agree as follows:

### ARTICLE 1
### Definitions

1.1.  Defined Terms.  As used herein, the terms below shall have the following meanings.  Singular and plural mean the singular or plural of such terms as the context indicates.

"Acquired Assets" shall be as defined in Section 2.1 hereof.

"Act" shall mean the Securities Act of 1933, as amended.

"Action" shall mean any and all actions, suits, investigations, proceedings, demands, assessments, audits, judgments and claims (including employment-related claims) relating to a Person.

"Administrative Service Agreement" shall mean the Administrative Service Agreement between Buyer and Seller to be entered into on the Closing Date.

"AKT" shall mean Environmental Consultants, Inc.

"Assignment and Assumption Agreement" shall mean the Assignment and Assumption Agreement between Seller and Buyer in the form attached hereto as Exhibit A.

"Bill of Sale" shall mean the Bill of Sale by Seller to Buyer in the form attached hereto as Exhibit B.

"Clean-up Costs" shall be defined in Section 3.3 hereof.

"Closing Date" shall be as defined in Section 10.1 hereof.

"Closing" shall mean the closing of the Transactions on the Closing Date.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Damages" shall mean any and all damages, losses, obligations, deficiencies, liabilities, claims, encumbrances, penalties, costs, and expenses, including reasonable attorneys' fees and disbursements (including, without limitation, expert and consulting fees, costs and expenses).

"Deed" shall mean the statutory form warranty deed excepting therefrom permitted Encumbrances, from Seller to Buyer conveying good and marketable title in and to the Facility to Buyer.

"Encumbrances" shall mean any claim, mortgage, assignment, conditional sale, lease, consignment, bailment, contingent interest, lien, pledge, option, charge, easement, security interest, encumbrance or other right of any Person.

"Equipment" shall be as defined in Section 2.1.

"Equipment Leases" shall be as defined in Section 2.1.

"Escrow Account" shall be as defined in Section 3.3 hereof.

"Escrow Agent" shall be as defined in Section 3.3 hereof.

"Escrow Agreement" shall be ad defined in Section 3.3 hereof.

"Escrow Amount" shall be as defined in Section 3.3 hereof.

-2-

"Facility" shall mean the real property and improvements located 26500 Capital Avenue, Redford, Michigan, owned by Seller, as further described on Schedule 2.1 attached hereto.

"Financial Statements" shall mean the unaudited interim financial statements of the Seller, dated June 30, 1996, presented by Seller to Buyer in connection with the purchase by Buyer of the Acquired Assets and, in the case of the financial statements for the year ended October 31, 1995, attested to by Seller's independent certified public accountant attached hereto as Exhibit C.  With respect to the income statements for the years ending October 1992, 1993 and 1994 and the balance sheet for the year ending 1994, they were prepared in good faith and consistent with the financial statements for the year ended October 31, 1995, and fairly presents the information presented by management of Seller.

"Flood Plain" shall be as defined in Section 5.1.14 (j) hereof.

"GAAP" shall mean generally accepted accounting principles consistently applied by Seller.

"Governmental Entity" shall mean any domestic, federal, state or local department, official, commission, authority, board, bureau, agency or other public body.

"Guarantee" shall mean the Guarantee for the benefit of Seller in the form attached hereto as Exhibit I.

"IRS" shall mean the Internal Revenue Service.

"Laws" shall mean all laws, statutes, ordinances, regulations and rules applicable to a Person, whether federal, state or local, including, without limitation, all laws, statutes, ordinances, regulations and rules regulating disclosure of sensitive personal healthcare information.

"License Agreement" shall mean the License Agreement from Seller to and in favor of Buyer in the form of Exhibit D attached hereto.

-3-

"Net Book Value" shall mean the value of the Acquired Assets as of the Closing Date.

"Non-Competition Agreement" shall mean the Non-Competition Agreement from Seller to and in favor of Buyer in the form of Exhibit E attached hereto.

"Note" shall mean the Promissory Note of Buyer in favor of Seller in the form attached hereto as Exhibit H.

"Orders" shall mean all orders, judgments, writs, injunctions, decrees or awards applicable to a Person.

"Patents" shall mean the patents being assigned by Ziebart to Buyer pursuant to the Patent Assignment.

"Patent Assignment" shall mean the Patent Assignment from Ziebart to and in favor of Buyer in the form of Exhibit F.

"Permit" or "Permits" shall mean all licenses, zoning variances, approvals, consents, orders or other authorizations.

"Person" shall mean any natural person, corporation, partnership, unincorporated association, trust, government, governmental agency, joint venture or trade group, or any entity or group that is a part of, or associated with, any of the foregoing.

"Phase I" shall mean the Phase I environmental audit defined in Section 6.4.

"Phase II" shall mean the Phase II environmental audit defined in Section 6.4.

"Purchase Price" shall be as defined in Article 3 hereof.

"Representative" shall mean any officer, director, principal, attorney, agent, accountant, consultant or employee.

"Securities Laws" shall mean any securities law (other than the Act) of any state or commonwealth of the United States.

-4-

"Stock Pledge and Security Agreement" shall mean the Stock Pledge and Security Agreement between Ziebart and the stockholders of Buyer in the form of Exhibit K attached hereto.

"Supply Agreement" shall mean the Supply Agreement between Seller and Buyer in the form of Exhibit G attached hereto.

"Taxes" shall mean all taxes, fees, levies, duties, charges or other like assessments including, without limitation, income, withholding, gross receipts, excise, real or personal property, asset, sales, use, license, payroll, transaction, capital, net worth and franchise taxes imposed by or payable to any federal, state, county or local government, taxing authority, subdivision or agency thereof, including interest, penalties, additions to tax or additional amounts thereto.

"Tax Return" shall mean any report, return, declaration or other information required to be supplied to a taxing authority in connection with Taxes.

"Transactions" shall mean the transactions contemplated under this Agreement and the other agreements referred to herein.

"Transfer Taxes" shall mean any applicable documentary, sales, use, filing, transfer and similar taxes payable as a result of the transfer of the Acquired Assets to Buyer.

"Warehousing Agreement" shall mean the Warehouse Services Agreement between Buyer and Ziebart to be entered into on the Closing Date.

## ARTICLE 2

## Sale and Purchase of Assets

2.1.  Assets to be Acquired.  Subject to the terms and conditions contained herein, on the Closing Date, Seller shall sell, transfer and assign to Buyer, and Buyer shall purchase and acquire from Seller, good and marketable title to all of the assets of Seller currently used by Seller at the Facility or elsewhere in connection with the business conducted

-5-

at the Facility which are necessary, important or useful to the
business conducted at the Facility as set forth in Schedule 2.1,
which Schedule 2.1 shall be provided by Seller subsequent to the
date hereof and shall include all known assets used in connection
with the Facility and operations being sold, or assets listed in
any attachment or schedule thereto and any replacement or
substituted asset thereof (the "Acquired Assets"), in each case
free and clear of all liens, charges, security interests and
other encumbrances except for the equipment leases as set forth
in Schedule 2.1, including, without limitation:

      (a)   The Facility and all the structures,
improvements and fixtures on or relating to the Facility, as
listed in Schedule 2.1 hereto, and all rights of way, uses,
licenses, easements, hereditaments, tenements and appurtenances
belonging or appertaining thereto;

      (b)   All machinery, equipment, tools,
furniture, fixtures, vehicles and other tangible assets of Seller
(collectively, "Equipment") listed in Schedule 2.1 hereto;

      (c)   All rights or choses in action of Seller,
whether now existing or hereafter arising, against manufacturers,
vendors, subcontractors or any other third party with respect to
any of the Acquired Assets or any part thereof, including,
without limitation, all product warranties thereon listed in
Schedule 2.1 hereto and all rights under express or implied
warranties;

      (d)   Copies of all price lists, customer and
vendor lists, historical sales data and other records, files and
data relating to the Acquired Assets for the period since
November 1, 1992;

      (e)   All customer files, including copies of
all purchase orders, since November 1, 1992;

      (f)   All of Seller's rights under the equipment
leases listed in Schedule 2.1 hereto (collectively, the
"Equipment Leases");

      (g)   All unfilled customer orders (the
"Orders") and other products and all deposits and other payments
relating thereto, listed in Schedule 2.1 hereto;

-6-

(h)   The Patents and all specifications, processes, know-how, building blueprints and drawings, software relevant to the operation of the business conducted at the Facility, formulae, technology, trade secrets, and proprietary information relating to or used or useful in connection with the development, manufacture, or other aspects of the business conducted at the Facility, including, without limitation, those items set forth in Schedule 2.1 hereto and all intellectual property rights of Seller and/or Ziebart in the product developed by Ziebart known as Solvent-Based Fire-Resistant Undercoating, including any rights with respect to a patent on such product (Patent Application # [            ]); provided that, Ziebart agrees diligently to pursue the prosecution of a patent on such product and Buyer agrees to reimburse Ziebart for costs incurred by Ziebart in the prosecution of such patent development and testing, including customer testing, which actual costs shall not be in excess of Fifty Thousand ($50,000) Dollars.  Buyer shall be obligated to pay reimbursement to Ziebart of the Solvent-Based Fire-Resistant Undercoating within eighteen (18) months of closing.  If Buyer does not reimburse Ziebart within said eighteen (18) months, Buyer shall be obligated to resign said patent to Ziebart forthwith.

2.2.   Excluded Assets.  Notwithstanding the foregoing, the Acquired Assets shall not include any of the following:

(a)   All accounts receivable and notes receivable of Seller;

(b)   All inventory, supplies, raw materials, finished goods manufactured for OEM customers, and other inventory of Seller;

(c)   The rights which accrue or will accrue to Seller under this Agreement.

2.3.   Closing Schedule.  On the Closing Date, Seller shall deliver to Buyer a schedule updating Schedule 2.1 for changes arising or occurring between the date hereof and the Closing Date (the "Closing Schedule"), and specifying the Acquired Assets and the Net Book Value of the Acquired Assets as of the closing, with such changes from the original Schedule 2.1 as permitted pursuant to the terms hereof.  The Closing Schedule shall be satisfactory in form and detail to Buyer.

-7-

2.4.   <u>Conveyance</u>.  On the Closing Date, Seller shall convey to Buyer good and marketable title to the Acquired Assets, free and clear of all pledges, claims, assessments, leases, charges, mortgages, liens (including federal, state, and local tax liens), security interests, encumbrances, except as disclosed in <u>Schedule 2.1</u> hereto.

## ARTICLE 3

### Purchase Price and Payment

3.1.   <u>Initial Purchase Price</u>.  The total purchase price to be paid by Buyer to Seller for the Acquired Assets (the "Purchase Price") shall consist of the following:

3.1.1  The Purchase Price shall be an amount equal to Three Million Forty Two Thousand Dollars ($3,042,000).

3.2.   <u>Payment of Purchase Price</u>.  The Purchase Price shall be payable as follows:

3.2.1   Five Hundred Thousand Dollars ($500,000) shall be payable by Buyer's promissory note (the "Note") substantially in the form attached hereto as <u>Exhibit H</u>. The Note shall bear interest at the rate of ten percent (10.%) per annum and shall be secured by a guarantee (the "Guarantee") substantially in the form attached hereto as <u>Exhibit I</u>.  Said Note shall be further secured by a Security Agreement in favor of Seller pledging  51% of the outstanding stock of Buyer substantially in the form attached hereto as Exhibit K.  The principal on the Note shall be paid in two equal annual installments on the first and second anniversary of the Closing Date.  Interest payments shall be made quarterly in accordance with the terms of the Note.   The  Note, including any accrued interest to date, may be prepaid in whole or in part at any time without premium or penalty.  The Note and any security therefore, shall be subordinate to the initial financing provided by Comerica Bank loan to Buyer to provide the Cash Payment and to Comerica working capital and the initial industrial bond financing, but not to any other financing by Buyer.

3.2.2  The remainder of the  Purchase Price, less the Escrow Amount, shall be deemed to be the "Cash Payment." The Cash Payment shall be payable in immediately available funds

-8-

on the Closing Date by wire transfer to Seller's bank account or by delivery of a certified check payable to Seller.

3.3. <u>Escrow</u>. At or prior to Closing, Seller and Buyer shall enter into an escrow agreement in the form attached hereto as <u>Exhibit L</u> (the "Escrow Agreement"), providing for the establishment of an escrow account (the "Escrow Account") to be administered by [Comerica Bank] as escrow agent (the "Escrow Agent"). At the Closing, a portion of the Purchase Price equal to a highly reliable estimate of the costs of clean-up ("Clean-up Costs") required at the Facility, as determined in the Phase II environmental audit conducted by AKT, shall be deposited in cash with the Escrow Agent. The Escrow Amount and any earnings thereon shall be held by the Escrow Agent in accordance with the provisions of the Escrow Agreement. The Escrow Amount including any earnings thereon shall be distributed in the following order of priority:

(a) First, to Buyer in an amount equal to any Clean-up Costs incurred by Buyer; <u>provided</u> that nothing contained in this Section 3.3 shall in any way limit the indemnification obligations of Seller to Buyer to the full extent provided in this Agreement;

(b) Second, upon the completion of the work associated with the Clean-up Costs, any funds remaining in the Escrow Account (including earnings) after the distributions described in Sections 3.3(a) and (b) hereof, to Seller.

3.3.1. <u>Earnest Money Deposit</u>. Buyer and Seller acknowledge the Buyer has placed an Earnest Money Deposit in the amount of Three Hundred Thousand ($300,000) Dollars with Houlihan, Lokey, Howard & Zukin, agents for the Seller, and is to be held pursuant to that certain Pre-Closing Escrow Agreement to be executed by Buyer and Seller simultaneously with the execution of this Agreement.

3.4. <u>Allocation of Purchase Price</u>. The Purchase Price shall be allocated among the Acquired Assets as set forth in the Allocation Schedule attached hereto as <u>Schedule 3.4</u>. The Allocation Schedule, which shall be binding on Buyer and Seller for tax purposes, shall be adjusted at the Closing to reflect any adjustments to the Acquired Assets, and corresponding additions to or deletions from the Allocation Schedule.

-9-

## ARTICLE 4

### Liabilities of Seller

4.1.  <u>No Assumption</u>.  Other than amounts due under the Equipment Leases listed in <u>Schedule 2.1</u>, Buyer shall not acquire, discharge, assume, or become responsible for any debts, liabilities, or obligations of Seller, or to which the Acquired Assets may be subject under this Article 4 or otherwise, including, without limitation, any liability or obligation in respect of any of the following:

(a)   Accounts payable of Seller;

(b)   Any product liability or similar claim for injury to Person or property, regardless of when made or asserted, which arises out of or is based upon any express or implied representation, warranty, agreement or guarantee made by Seller, or alleged to have been made by Seller, or which is imposed or asserted to be imposed by operation of law, in connection with any service performed or product sold or leased by or on behalf of Seller on or prior to the Closing, including without limitation any claim relating to any product delivered in connection with the performance of such service and any claim seeking recovery for consequential damage, lost revenue or income;

(c)   Any federal, state or local income or other tax (i) payable with respect to the business, assets, properties or operations of Seller or any affiliate of Seller for any period on or prior to the Closing Date, or (ii) incident to or arising as a consequence of the negotiation or consummation by Seller or any affiliate of Seller of this Agreement and the Transactions;

(d)   Any liability or obligation for Clean-up Costs;

(e)   Any liability or obligation arising prior to or as a result of the Closing to any employees, agents or independent contractors of Seller, whether or not employed by Buyer after the Closing; or

(f)   Any liability or obligation of Seller or any shareholder of Seller arising or incurred in connection with

-10-

the negotiation, preparation and execution of this Agreement and the Transactions.

## ARTICLE 5

### Representations and Warranties

5.1.  <u>Representations and Warranties of Seller and Ziebart</u>.  Seller and Ziebart hereby jointly and severally represent and warrant as follows:

5.1.1  <u>Corporate Existence</u>.  Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Michigan; has full corporate power and authority to carry on its businesses as they are now being conducted and to own and operate the properties and assets now owned and operated by it; is duly qualified to do business and is in good standing in each jurisdiction where the conduct of its businesses or the ownership of its properties and assets require such qualification.  Complete and correct copies of the Articles of Incorporation of Seller, together with all amendments thereto, certified by the Secretary of State of Michigan and complete and correct copies of the Bylaws of Seller, together with all amendments thereto, certified by the Secretary of Seller have been delivered to Buyer.

5.1.2  <u>Corporate Power; Authorization</u>.  Seller has full corporate power and authority to transfer the Acquired Assets to Buyer.  Seller has full corporate power and authority to enter into this Agreement, and to perform all of Seller's covenants and undertakings herein set forth upon the terms and conditions set forth herein; the execution and delivery of this Agreement on behalf of Seller by the officers of Seller so executing and delivering this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Seller.

5.1.3  <u>Validity</u>.  Neither the execution and delivery of this Agreement nor the consummation of the Transactions in the manner herein provided will:

(i)  contravene any provision of the Articles of Incorporation or Bylaws of Seller;

-11-

   (ii) violate, be in conflict with, constitute a default under, cause the acceleration of any payments pursuant to, or otherwise impair the good standing, validity, or effectiveness of any agreement, contract, indenture, lease, or mortgage to which Seller is a party or by which Seller or any of the Acquired Assets is bound; or

   (iii) to the best of Seller's knowledge, violate any provision of law, rule, regulation, order, permit, or license to which Seller is subject, or pursuant to which Seller conducts its business;

   No authorization, approval or consent of, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery or performance of this Agreement by Seller.

   5.1.4 <u>Title</u>. Seller owns and has legal and marketable title to all of the Acquired Assets and, on the Closing Date, will own and have legal and marketable title to all of the Acquired Assets, free and clear of all pledges, claims, assessments, leases, options, charges, agreements, contracts, commitments, mortgages, indentures, liens (including federal, state, and local tax liens), security interests, encumbrances, and other restrictions.

   5.1.5 <u>Financial Statements</u>. The Financial Statements were prepared in good faith by the management of Seller and the Financial Statements fairly present the information presented therein, and do not omit any material liability of Seller or overstate any income or asset of Seller.

   5.1.6 <u>Tangible Assets</u>. The Acquired Assets listed in <u>Schedule 2.1</u> include all of the known assets of Seller currently used by Seller at the Facility, or elsewhere in connection with the business conducted at the Facility which are necessary, important or useful to the business conducted at the Facility. All buildings, structures, facilities, equipment and other material items of tangible property and assets, which would be included in the Acquired Assets if the Closing took place on the date hereof are in good operating condition and repair, subject to normal wear and maintenance, are usable in the regular

-12-

and ordinary course of business and to the best of Seller's knowledge after reasonable inquiry, conform to all applicable laws, ordinances, codes, rules and regulations, and authorizations relating to their use and operation.  No person other than Seller owns any equipment or other tangible assets or properties situated at the Facility of Seller or necessary to the operation of the business of Seller conducted at the Facility, except for leased items disclosed in Schedule 2.1.

        5.1.7  Seller's Litigation.  Except as set forth in Schedule 5.1.7 attached hereto, there is no suit, action, claim, arbitration, administrative or legal or other proceeding, or governmental investigation pending or, to Seller's knowledge, threatened against or related to Seller, nor to Seller's knowledge any failure to comply with, or any default under, any law, ordinance, requirement, regulation, or order applicable to Seller, nor any violation of or default with respect to any order, writ, injunction, judgment, or decree of any court or federal, state, or local department, official, commission, authority, board, bureau, agency, or other instrumentality issued or pending against Seller, which might have an adverse effect on Buyer's acquisition, ownership or use of the Acquired Assets or operation of the business conducted at the Facility.  Seller has obtained all necessary or proper permits, licenses, approvals, and other authorizations for the complete operation of the business conducted at the Facility as presently operated, and all are listed in Schedule 2.1 attached hereto.   To Seller's knowledge after reasonable inquiry, except for the disclosures contained in the AKT Environmental Consultants Report dated August 12, 1996 (Project No. 977.20.01), all such permits, licenses, approvals, and authorizations are presently valid and in full force and no revocation, cancellation, or withdrawal thereof has been effected or, threatened.  Seller will take such steps as may be necessary and proper to renew or revalidate any such permits, licenses, approvals, and authorizations which may become void, expired, terminated, canceled, or withdrawn between the date hereof and the Closing Date.

        5.1.8  Insurance.  All machinery, equipment, buildings, improvements, and other tangible assets owned or leased by Seller and included in the Acquired Assets are, and between the date hereof and the Closing Date will be, insured against fire and casualty under the policies and in the amounts and types of coverage set forth in Schedule 5.1.8 attached

-13-

hereto; <u>Schedule 5.1.8</u> attached hereto is a true and correct
schedule of all policies of fire, liability, and other forms of
insurance, excluding those listed in <u>Schedule 5.1.8</u> attached
hereto, held by Seller or with respect to which Seller directly
or indirectly pays all or part of the premium in connection with
the Acquired Assets.

     5.1.9   <u>Intellectual Property</u>.   Seller owns,
possesses, or lawfully uses the Patents and the trade names to be
conveyed to Buyer hereunder free and clear of all liens, pledges,
claims, encumbrances, and other restrictions of any nature.
Seller has no knowledge of any claim or reason to believe that it
is or may be infringing on or otherwise acting adversely to the
rights of any person under or in respect of the Patent or trade
names.   Seller is not obligated or under any liability whatever
to make any payments by way of royalties, fees, or otherwise to
any owner or licensee of or other claimant to the Patents or
trade names or with respect to the use thereof, in connection
with the conduct of the business conducted at the Facility.

     5.1.10   <u>Labor Contracts</u>.   Seller is not a party
to any contract or other agreement with any labor union in
connection with the operation of the business conducted at the
Facility.

     5.1.11   <u>Contracts and Commitments</u>.   Except as
listed in <u>Schedule 5.1.11</u>, Seller is not, in connection with the
ownership of the Acquired Assets, a party to any written or oral:

          (a)   agreement, contract or commitment
with any present or former employee or consultant or for the
employment of any person, including any consultant; or

          (b)   agreement, contract or commitment for
the future purchase of, or payment for, supplies or products, or
for the performance of services by a third party which supplies,
products or services are used in the conduct of the business
conducted at the Facility.

     Each of the contracts listed in <u>Schedule 2.1</u>
under which Buyer is to acquire rights or obligations hereunder
is to Seller's knowledge valid and enforceable in accordance with
its terms; Seller is, and to Seller's knowledge all other parties
thereto are, in compliance with the provisions thereof; Seller is
not, and to Seller's knowledge no other party thereto is, in

-14-

default in the performance, observance or fulfillment of any
material obligation, covenant or condition contained therein; and
to Seller's knowledge no event has occurred which with or without
the giving of notice or lapse of time, or both, would constitute
a default thereunder.

### 5.1.12  Environmental Matters.

(a)  To the best of Seller's knowledge
after reasonable inquiry, except for the disclosures contained in
the AKT Environmental Consultants report dated August 12, 1996
(Project # 977.20.01), Seller has obtained all permits, licenses
and other authorizations which are required in connection with
the conduct of the business conducted at the Facility under
regulations relating to pollution or protection of the
environment, including regulations relating to emissions,
discharges, releases or threatened releases of pollutants,
contaminants, chemicals, or industrial, toxic or hazardous
substances or wastes into the environment (including without
limitation ambient air, surface water, groundwater, or land), or
otherwise relating to the manufacture, processing, distribution,
use, treatment, storage, disposal, transport, or handling of
pollutants, contaminants, chemicals, or industrial, toxic or
hazardous substances or wastes.

(b)  To the best of Seller's knowledge
after reasonable inquiry, except for the disclosures contained in
the AKT Environmental Consultants report dated August 12, 1996
(Project # 977.20.01), Seller is in full compliance in the
conduct of the business conducted at the Facility with all terms
and conditions of the required permits, licenses and
authorizations, and is also in full compliance with all other
limitations, restrictions, conditions, standards, prohibitions,
requirements, obligations, schedules and timetables contained in
those laws or contained in any regulation, code, plan, order,
decree, judgment, injunction, notice or demand letter issued,
entered, promulgated or approved thereunder.

(c)  In connection with the conduct of the
business, conducted at the Facility, Seller is not aware of, nor
has Seller received notice of, any past, present or future
events, conditions, circumstances, activities, practices,
incidents, actions, or plans which may interfere with or prevent
compliance or continued compliance with those laws or any
regulations, code, plan, order, decree, judgment, injunction,

-15-

notice or demand letter issued, entered, promulgated or approved thereunder, or which may give rise to any common law or legal liability, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study or investigation, based on or related to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling, or the emission, discharge, release or threatened release into the environment, of any pollutant, contaminant, chemical, or industrial, toxic or hazardous substance or waste.

(d)   There is no civil, criminal or administrative action, suit, demand, claim, hearing, notice or demand letter, notice of violation, investigation, or proceeding pending or threatened against Seller in connection with the conduct of the business conducted at the Facility relating in any way to those laws or any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder.

(e)   Seller agrees to cooperate with Buyer in connection with Buyer's application for the transfer, renewal or issuance of any permits, licenses, approvals or other authorizations or to satisfy any regulatory requirements involving the business conducted at the Facility.

### 5.1.13  Facility.

(f)   Utility Services.  The water, electric, gas and sewer utility services and storm drainage facilities currently available to the Facility are adequate for the present use of the Facility by Seller, are being supplied to Seller by utility companies or municipalities pursuant to valid and enforceable contracts, and to the best of Seller's knowledge, there is no condition which will result in the termination of the present access from the Facility to such utility services and other facilities.

(g)   Access.  Seller has obtained all authorizations and rights-of-way, including proof-of-dedication, which are necessary to ensure vehicular and pedestrian ingress and egress to and from the Facility.  To the best of Seller's knowledge, there are no restrictions on entrance to or exit from the Facility to adjacent public streets and no conditions which will result in the termination of the present access from the Facility to existing highways and roads.

-16-

(h)  <u>Assessments or Hazards</u>.  Seller has received no notices, oral or written, from any governmental body, that the assessed value of the Facility has been determined to be greater than that upon which county, township or school tax was paid for the 1995 tax year applicable to each such tax, or from any insurance carrier of Seller of fire hazards with respect to the Facility.

(i)  <u>Eminent Domain</u>.  Seller has received no notices, oral or written, and has no reason to believe, that any governmental body having the power of eminent domain over the Facility has commenced, or intends to exercise the power of eminent domain or a similar power with respect to all or any part of the Facility.  If between the date of this Agreement and Closing, the Facility or any portion thereof or interest therein shall be taken or condemned as a result of the exercise of the power of eminent domain, or if a governmental body having the power of eminent domain informs Seller or the Buyer that it intends to take or condemn all or part of the Facility, then the Buyer may elect to terminate this Agreement.

(j)  <u>No Violations</u>.  To Seller's knowledge, the Facility and the present uses thereof comply with all regulations of all governmental bodies having jurisdiction over the Facility.  Seller has received no notices, oral or written, from any governmental body, and has no reason to believe, that the Facility or any improvements erected or situated thereon, or the uses conducted thereon or therein, violate any regulations of any governmental body having jurisdiction over the Facility.

(k)  <u>Improvements</u>.  The improvements located on the Facility are in good condition and are structurally sound, and all mechanical and other systems located therein are in good operating condition.  To Seller's knowledge no condition exists requiring material repairs, alterations or corrections.  Seller has obtained a Certificate of Occupancy and all other necessary licenses, permits and approvals to operate the Facility in accordance with all applicable laws, rules and ordinances.

(l)  <u>No Encumbrances</u>.  Between the date of this Agreement and Closing, Seller shall not sell, mortgage or encumber the Facility, or do or permit any act which diminishes title to or value of the Facility.

-17-

(m)   <u>Public Improvements</u>.   No work for municipal improvements has been commenced on or in connection with the Facility or any street adjacent thereto.   No notice from any county, township or other governmental body has been served upon the Facility or received by Seller requiring or calling attention to the need for any work, repair, construction, alteration or installation on or in connection with the Facility which has not been complied with.

(n)   <u>Surveys</u>.   Two weeks prior to Closing, Seller shall deliver to the Buyer a complete as-built survey of the Facility, which survey shall conform to ALTA standards and be certified by a licensed Michigan surveyor. Said survey shall be certified to Seller, Comerica Bank, Sentry and the Title Company.

(o)   <u>Flood Plain</u>.   To the best of Seller's knowledge, no part of the Facility contains, is located within, or abuts any flood plain, navigable water or other body of water, tideland, wetland, marshland or any other area which is subject to special state, federal or municipal regulation, control or protection (collectively a "Flood Plain").   Prior to Closing, Seller shall deliver to the Buyer a survey of the Facility evidencing that the preceding representation and warranty is true and correct.

5.1.14   <u>Restrictions</u>.   Seller is not a party to any plan, license, permit authorization or other instrument, document or understanding, oral or written, or subject to any charter or other corporate restriction or any judgment, order, writ, injunction, decree or award, which materially adversely affects or materially restricts or, so far as Seller can now reasonably foresee, may in the future materially adversely affect or materially restrict, the business conducted at the Facility, after consummation of the transactions contemplated hereby.

5.1.15   <u>Conditions Affecting Seller</u>.   There is no fact, development or threatened development with respect to the markets, products, services, clients, customers, facilities, computer software, data bases, personnel, vendors, suppliers, operations, assets or prospects of the business conducted at the Facility, which are known to Seller, which would materially adversely affect the business conducted at the Facility other than such conditions as may affect as a whole the economy generally.

-18-

5.1.16  Note.  In connection with the transfer of the Acquired Assets to Buyer in consideration for the Note. ("Note"):

(iv) Seller is acquiring the Note exclusively for its own account for investment and not with a view to distribution or resale in violation of the Act;

(v)  Seller understands that the Note is a "restricted security" within the meaning of Rule 144 under the Act and has not been registered under the Act and that Seller must be prepared to bear the economic risk of holding the Note until its maturity, unless the Note is subsequently registered under the Act or an exemption from registration is available;

(vi) Seller acknowledges that there is no market for the Note and that none is likely to develop and that Buyer does not have any obligation to register the Note nor to take any action to make compliance with an exemption from registration available;

(vii)    Seller has had the opportunity to ask questions and receive information respecting Buyer;

(viii)    Seller understands that the Note will bear a legend in substantially the following form:

This Note was issued in a transaction exempt from registration under the Securities Act of 1933, as amended, and may not be transferred in the absence of an effective registration statement with respect thereto, or an opinion of counsel satisfactory to the issuer that the transfer is exempt from registration under said Act.

; and

(ix) Seller will repeat these representations and acknowledgments immediately prior to the issuance to it of the Note.

5.1.17  Complete Disclosure.  No representation or warranty of the Seller in this Agreement, nor any document, statement, or certificate furnished nor to be furnished to Buyer pursuant hereto nor in connection with the Transactions  contains

-19-

any untrue statement of a material fact, nor omits nor will omit to state a material fact necessary to make the statements contained therein not misleading.

     5.2  <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller on behalf of itself as follows:

     5.2.1  <u>Corporate Existence</u>.  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware.  Buyer has full corporate power and authority to enter into this Agreement and Buyer has full corporate power and authority to purchase and take title to the Acquired Assets upon the terms and conditions set forth herein;

     5.2.2  <u>Validity</u>.  Neither the execution and delivery of this Agreement the Note, nor the consummation of the transactions contemplated hereby in the manner herein provided will:

     (i)  contravene any provision of the Certificate of Incorporation or Bylaws of Buyer;

     (ii)  violate, be in conflict with, constitute a default under, cause the acceleration of any payments pursuant to, or otherwise impair the good standing, validity, and effectiveness of any lease, license, permit, authorization, or approval applicable to Buyer; or and

     (iii)  violate any provision of law, rule, regulation, order, or permit to which Buyer is subject.

     5.2.3  <u>Authorization</u>.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Buyer, and this Agreement is a valid and binding obligation of Buyer, enforceable in accordance with its terms.

## ARTICLE 6

### Agreements Pending Closing

6.1  <u>General Covenants of Seller</u>.  Seller hereby covenants as follows:

6.1.1  Seller shall assign to Buyer or cause the assignment to Buyer of, with if necessary, the consent or approval to such assignments of all other contracting parties, all contracts designated for assignment in <u>Schedule 2.1</u> attached hereto.

6.1.2  Seller shall cooperate with Buyer to obtain the consent or approval of the appropriate agency or body to the issuance or assignment to Buyer of any permits, license, approvals or other authorizations necessary or desirable for the operation of the business conducted at the Facility.

6.2  <u>Operation of Business</u>.  Seller hereby agrees that from and after the date hereof to the Closing Date, except as otherwise contemplated by this Agreement, Seller shall conduct the Business solely in the ordinary course and shall:

6.2.1  not amend its Articles of Incorporation or Bylaws in any manner which would frustrate the consummation of the Transactions;

6.2.2  not change its corporate name or permit the use thereof by any other corporation;

6.2.3  not pay or agree to pay to any employee, of Seller engaged in the business conducted at the Facility, without the written consent of Buyer, compensation that is in excess of the current compensation level of such employee, except in the ordinary course of business;

6.2.4  not make any changes in the management of the business conducted at the Facility without the written consent of Buyer;

6.2.5  not sell, transfer, or otherwise dispose of any Acquired Assets without the prior written consent of Buyer;

-21-

6.2.6  maintain the Acquired Assets in good operating repair, order, and condition, reasonable wear and tear excepted, and notify Buyer immediately upon any loss of, damage to, or destruction of any of the Acquired Assets;

6.2.7  maintain in full force and effect insurance coverage of the types and in the amounts set forth in Schedule 5.1.10 attached hereto and apply the proceeds received under any insurance policy or as a result of any loss or destruction of or damage to any Acquired Asset to the repair or replacement of such Acquired Asset;

6.2.8  maintain in full force and effect all agreements, contracts, leases, licenses, permits, authorizations, and approvals necessary for or related to the operation of the business conducted at the Facility;

6.2.9  use its best efforts to preserve Seller's organization in connection with the business conducted at the Facility intact;

6.2.10  promptly advise Buyer in writing of the commencement of, and of any known threat to commence any, suit, claim, action, arbitration, legal or administrative proceeding or governmental investigation against Seller in connection with the Acquired Assets; and

6.2.11  promptly disclose to Buyer any information contained in its representations and warranties or the Schedules which, because of an event occurring after the date hereof not constituting a breach or violation of this Agreement, is materially incomplete or is no longer materially correct as of all times after the date hereof until the Closing Date.

6.3  Access to Information.  The Confidentiality Agreement dated _____, 1995 between Buyer and Seller shall survive the execution of this Agreement until the Closing Date at which time said Confidentiality Agreement shall terminate. Seller agrees to cooperate with Buyer and provide Buyer and its designated representatives, during normal business hours and, upon reasonable notice, full access to the books, records, equipment, real estate, the Equipment Leases, and other assets of Seller relating to the Acquired Assets, and furnish to Buyer and its representatives copies of such documents, records, and

-22-

information with respect to the Acquired Assets as Buyer or such representatives may reasonably request.

      6.4  <u>Environmental Audits</u>.  Seller has provided Buyer, at Seller's expense, an updated Phase I Environmental Audit (the "Phase I") completed by AKT with respect to the facility.  Buyer has obtained the updated Phase II Environmental Audit ("Phase II") by AKT dated August 12, 1996 (Project No. 977.20.01).  Seller and Buyer shall each pay one-half of the costs of the Phase II Audit.

<u>**ARTICLE 7**</u>

<u>**Conditions Precedent to the Closing**</u>

      7.1.  <u>Obligation of Buyer to Close</u>.  The obligation of Buyer to consummate the purchase of the Acquired Assets on the Closing Date shall be subject to the satisfaction of the following conditions on or prior to the Closing Date:

      7.1.1  <u>No Adverse Change</u>.  No materially adverse change shall have occurred after the date hereof and remain in effect as of the Closing Date with respect to the condition of any of the Acquired Asset, or performance of business being operated at the Facility.

      7.1.2  <u>Insurance; Financing</u>.  Buyer, at its own expense, shall have obtained on terms satisfactory to it:

      (i) policies of title insurance respecting the Facility insuring Buyer's title thereto without standard exceptions, including zoning endorsements (the "Endorsements") acceptable to Buyer and evidence (the "Evidence") satisfactory to Buyer that the Facility does not lie within a Flood Plain, provided that Seller shall bear any additional cost associated with such title insurance policies as a result of the inclusion of the Endorsements and the Evidence in such policies, and

Notwithstanding any term or condition of this Agreement to the contrary, Buyer shall confirm in writing to Seller that Buyer has obtained firm commitment from Comerica for such satisfactory financing on or before ten (10) days from the date of execution of this Agreement.  If Buyer does not provide such confirmation to Seller on or prior to the said Date, Seller may,

-23-

in its sole discretion, terminate this Agreement by giving notice of such termination to Buyer no more than five (5) days after the said Date.

7.1.3   _Permits_.  Buyer shall have obtained all permits, licenses and other authorizations required in connection with the operation of the Facility, including those under regulations relating to pollution or protection of the environment, including regulations relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment (including without limitation ambient air, surface water, groundwater, or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes.  The environmental conditions identified in the Phase I and Phase II environmental audits, subject to the completion of the work associated with the Clean-up Costs, are acceptable to Buyer in Buyer's sole discretion.

7.1.4   _Representations_. The representations and warranties of Seller set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date, and Seller shall have performed all covenants and agreements to be performed by them under this Agreement on or prior to the Closing Date, and Seller shall have delivered to Buyer certificates to such effect dated the Closing Date signed on behalf of Seller by its Executive Vice President, which certificates shall be in form and substance satisfactory to Buyer's counsel.

7.1.5   _Covenants_.  Seller shall have performed all covenants and agreements to be performed by it under this Agreement on or prior to the Closing Date and shall have delivered to Buyer a certificate to such effect, which certificates shall be in form and substance satisfactory to Buyer's counsel, dated the Closing Date and signed on behalf of Seller by its Executive Vice President.

7.1.6   _Closing Certificate_.  Seller shall have delivered to Buyer a certificate dated the Closing Date and signed on behalf of Seller by its Executive Vice President to the effect that the Transactions were duly authorized by all necessary corporate action on the part of Seller, which

-24-

certificate shall be in form and substance satisfactory to
Buyer's counsel.

    7.1.7   <u>Opinion of Seller's Counsel</u>.   May,
Simpson & Strote, counsel for Sellers, shall have delivered to
Buyer their opinion, dated the Closing Date, in the form
satisfactory to Buyer.

    7.1.8   <u>Required Information</u>.   Seller shall have
furnished all information required to be furnished by this
Agreement.

    7.1.9   <u>Closing Agreements</u>.   Seller shall have
executed and delivered to Buyer the agreements, instruments,
certificates and opinions required pursuant to Section 10.2.2
hereof.

    7.1.10   <u>No Loss</u>.   There shall not have occurred
any material loss of, damage to, or destruction of any of the
Acquired Assets.

    7.1.11   <u>Due Diligence</u>.   Buyer shall have ~~discresion~~
completed, and is satisfied in its sole and absolute ~~discision~~ EB
with, its due diligence related to its inspection of the
Facility, the operating condition of the facility and interview
of Seller's employees, vendors and customers who Buyer requests
to interview.   Interviews with vendors and customers of Seller
shall be conducted in a mutually agreed upon method prior to
Buyer's contract with said vendors and customers.

    7.2.   <u>Obligation of Seller to Close</u>.   The obligation
of Seller to consummate the sale of the Acquired Assets on the
Closing Date shall be subject to the satisfaction of the
following conditions on or prior to the Closing Date:

    7.2.1   <u>Representations</u>.   The representations
and warranties of Buyer set forth in this Agreement shall be true
and correct as of the date of this Agreement and as of the
Closing Date as though made on and as of the Closing Date, and
~~Buyer shall have delivered to Seller a certificate to such~~
effect, dated the Closing Date and signed by its President, which
certificate shall be in form and substance satisfactory to Seller
and its counsel.

7.2.2    <u>Covenants</u>.    Buyer shall have performed all covenants and agreements to be performed by it under this Agreement on or prior to the Closing Date and shall have delivered to Seller a certificate to such effect which certificates shall be in form and substance satisfactory to Seller's counsel, dated the Closing Date and signed on behalf of Buyer by its President.

7.2.3    <u>Opinion of Buyer's Counsel</u>.    Pepper, Hamilton & Scheetz, counsel for Buyer, shall have delivered to Seller their opinion dated the date of closing in a form satisfactory to Seller as to the validity of the Note, Stock Pledge and Guaranty.

7.3    <u>Obligation of Buyer and Seller to Close</u>.    The obligation of both Buyer and Seller to consummate the purchase of the Acquired Assets on the Closing Date shall be subject to mutual agreement on the form and content of the Warehousing Servicing Agreement and Administrative Support Agreement between the respective Parties.

## ARTICLE 8

## Indemnification

8.1.    <u>By Seller and Ziebart</u>.    If Closing occurs, Seller and Ziebart shall indemnify and hold harmless Buyer from and against any and all damages, losses, obligations, deficiencies, liabilities, claims, encumbrances, penalties, costs, and expenses, including reasonable attorneys' fees, which Buyer may suffer or incur, resulting from, related to, or arising out of (i) any material misrepresentation, material breach of warranty, or material nonfulfillment of any of the respective covenants of Seller and Ziebart in this Agreement, or (ii) from any material misrepresentation in or omission from any certificate, financial statement, or other document furnished  or to be furnished to Buyer hereunder, (iii) any and all actions, suits, investigations, proceedings, demands, assessments, audits, judgments, and claims (including employment-related claims) arising out of facts or conditions that have occurred or existed on or prior to the Closing Date in connection with the Facility or the business conducted at the Facility, even though such proceeding or claim may not be filed or come to light until after the Closing Date, and (iv) any claim or suit against Buyer from

-26-

any shareholder of Seller or Ziebart in his or her capacity as such and (v) any Clean-up Costs incurred by Buyer; provided, however, that before Buyer may assert a claim for indemnity under this Section, written notice of such claim shall have been given to Seller and Ziebart as provided in Section 8.4.

8.2. <u>Set-Off</u>. Buyer shall have the right to reduce its obligations under the Note by the amount of any liability of Seller or Ziebart under this Agreement or the Supply Agreement. Any such reductions in Buyer's obligations under the Note shall be applied to reduce the principal payments under the Note in the order that payments are due. This right will in no way limit Buyer's right to seek compensation, satisfaction, restitution, remuneration, and reparation from Seller and Ziebart in any other manner whatsoever.

8.3. <u>By Buyer</u>. If Closing occurs, Buyer agrees to indemnify and hold harmless Seller and Ziebart from and against any and all damages, losses, obligations, deficiencies, liabilities, claims, encumbrances, penalties, costs, and expenses, including reasonable attorneys' fees, which Seller or Ziebart may suffer or incur, resulting from, related to, or arising out of (i) any material misrepresentation, material breach of warranty, or material nonfulfillment of any of the covenants of Buyer in this Agreement, or (ii) from any material misrepresentation in or omission from any certificate or document furnished, or to be furnished to Seller or Ziebart hereunder, (iii) any and all suits, actions, investigations, proceedings, demands, assessments, audits, judgments, and claims arising out of acts by Buyer that occur on or subsequent to the Closing Date in connection with the business conducted at the Facility and (iv) any claim against Seller or Ziebart from any shareholder of Buyer in his or her capacity as such; provided, however, that before Seller or Ziebart may assert a claim for indemnity under this Section, Seller or Ziebart must give or cause to be given written notice of such claim to Buyer as provided in Section 8.4.

8.4. <u>Notice</u>. Promptly after acquiring knowledge of any damage, loss, deficiency, liability, claim, encumbrance, penalty, cost, expense, action, suit, investigation, proceeding, demand, assessment, audit, judgment, or claim against which Seller and Ziebart have indemnified Buyer or against which Buyer has indemnified Seller and Ziebart, or as to which any Party may be liable, Seller, Ziebart or Buyer, as the case may be, shall give to the other Parties written notice thereof. Each indemnifying Party shall, at its own expense, defend against and

-27-

contest any damage, loss, deficiency, liability, claim, encumbrance, penalty, cost, expense (including reasonable attorneys' fees), action, suit, investigation, proceeding, demand, assessment, audit, judgment, or claim against which it has indemnified an indemnified Party, and each indemnified Party shall receive from the other Parties all necessary and reasonable cooperation in said defense including, but not limited to, the services of employees of the other Parties, who are familiar with the transactions out of which any such damage, loss, deficiency, liability, claim, encumbrance, penalty, cost, expense, action, suit, investigation, proceeding, demand, assessment, audit, judgment, or claim may have arisen.  In the event that an indemnifying Party, after written notice from an indemnified Party, fails to take timely action to defend the same, the indemnified Party shall have the right to defend the same by counsel of its own choosing, but at the cost and expense of the indemnifying Party.  No indemnified Party shall have the right to settle or compromise any claim, demand, or litigation without the written consent of the indemnifying Party, except that any indemnified Party shall have the right to settle or compromise any claim, demand, or litigation against it if it has given written notice thereof to the indemnifying Party and the indemnifying Party has failed to take timely action to defend the same.

8.5.   Payment.  Upon the determination of the liability under Article 8, the appropriate Party shall pay to the other, as the case may be, within ten (10) days after such determination, the amount of any claim for indemnification made hereunder.  In the event that the indemnified Party is not paid in full for any such claim pursuant to the foregoing provisions promptly after the other Party's obligation to indemnify has been determined in accordance herewith, it shall have the right, notwithstanding any other rights that it may have against any other person, firm or corporation, to setoff the unpaid amount of any such claim against any amounts owed by it under any agreements entered into pursuant to this Agreement, or the related documents.  Upon the payment in full of any claim, either by setoff or otherwise, the entity making payment shall be subrogated to the rights of the indemnified Party against any person, firm or corporation with respect to the subject matter of such claim.

8.6.   Compliance with Bulk Sales Laws.  Buyer and Seller hereby waive compliance by Buyer and Seller with the bulk

-28-

sales law and any other similar laws in any applicable
jurisdiction in respect of the transactions contemplated by this
Agreement.   Seller and Ziebart shall indemnify Buyer from, and
hold it harmless against, any liabilities, damages, costs and
expenses (including reasonable attorneys' fees) resulting from or
arising out of (i) the Parties' failure to comply with any of
such laws in respect of the transactions contemplated by this
Agreement, or (ii) any action brought or levy made as a result
thereof.

        8.7.   <u>Other Rights and Remedies Not Affected</u>.   The
indemnification rights of the Parties under this Article 8 are
independent of and in addition to such rights and remedies as the
Parties may have at law or in equity or otherwise for any
misrepresentation, breach of warranty or failure to fulfill any
agreement or covenant hereunder on the part of any Party hereto,
including without limitation the right to seek specific
performance, rescission or restitution, none of which rights or
remedies shall be affected or diminished hereby.

## ARTICLE 9

### Survival of Representations, Warranties,
### Guarantees, and Covenants

        All representations, warranties, and covenants made
by Seller and Buyer in this Agreement or pursuant hereto shall
survive the Closing hereunder, and shall continue for a period of
three (3) years following the Closing Date.

## ARTICLE 10

### The Closing

        10.1.   <u>Time and Place</u>.   The closing of the
transactions contemplated hereby shall be held at 10:00 A.M. on
September 13, 1996, or at such other time and on such other date
as the Parties mutually agree to in writing (the "Closing
Date").

        The closing shall be held at the offices of May,
Simpson & Strote, P.C., 100 West Long Lake Road, Suite 200,
Bloomfield Hills, Michigan.

-29-

10.2.  Conduct of Closing.

10.2.1  Subject to the fulfillment of all of the conditions set forth in Section 7.1 and the delivery of all certificates and opinions required thereby, except such conditions as may be waived by the Parties, on the Closing Date Buyer shall deliver to Seller:

(i)  the certified check or evidence of the wire transfer provided for in Section 3.2.2;

(ii)  the certificates signed on behalf of Buyer by its President described in Sections 7.2.1 and 7.2.2;

(iii)  the Note duly executed by Buyer;

(iv)  the Supply Agreement duly executed by Buyer;

(v)  the Guarantee duly executed in favor of Seller;

(vi)  the opinion of Pepper, Hamilton & Scheetz, as counsel to Buyer, in the form acceptable to Seller;

(vii)  the Escrow Agreement duly executed by Seller;

(viii)  the Administrative Service Agreement duly executed by Buyer;

(ix)  the Stock Pledge and Security Agreement, which Buyer shall have caused to have been duly executed by necessary shareholders of Buyer.

(x)  the Warehousing Service Agreement duly executed by Buyer.

10.2.2  Subject to the fulfillment of all of the conditions set forth in Section 7.2 and the delivery of all certificates and opinions required thereby, except such conditions, certificates, and opinions as may be waived by the Parties, Seller shall deliver to Buyer:

-30-

(i)   the Warehousing Agreement duly executed by Ziebart;

(ii)   the Closing Schedule prepared in accordance with agreed upon procedures by Seller's independent certified public accountant;

(iii)   the certificates signed on behalf of Seller by its Executive Vice President described in Sections 7.1.4, 7.1.5 and 7.1.6;

(iv)   a certificate of Seller's Executive Vice-President to the effect that: (A) the Closing Schedule is a true and correct list of the Acquired Assets as at the Closing Date, and (B) the Closing Schedule was prepared in good faith by the management of Seller and fairly, accurately and completely presents the information presented therein;

(v)   the Deed duly executed by Seller;

(vi)   the Bill of Sale duly executed by Seller;

(vii)   the Assignment and Assumption Agreement duly executed by Seller;

(viii)   the Supply Agreement duly executed by Seller;

(xi)   the Non-Competition Agreement duly executed by Seller;

(x)   the License Agreement duly executed by Seller;

(xi)   the Patent Assignment duly executed by Seller;

(xii)   a comfort letter from Seller's accountant attesting to the accuracy of the Financial Statements for the year ended October 31, 1995, and the six months ending April 30, 1996, in form satisfactory to Buyer;

(xiii)   the opinion of May, Simpson & Strote as counsel to Seller in the form of Exhibit J attached hereto;

(xiv)  a certificate of the Michigan Department of State evidencing that Seller has changed its name as provided herein;

(xv)  a certificate of Seller consenting to Buyer's use of the name "ZP Corporation" and variants thereof duly executed by Seller in form satisfactory to Buyer;

(xvi)  in a form satisfactory to Buyer's counsel, all such endorsements, assignments, novations, and other good and sufficient instruments of transfer and conveyance, including waivers or consents of lessors and other third parties and releases, satisfactions, and termination statements from secured parties, as may be necessary to vest in Buyer good, absolute, and marketable title to the Acquired Assets, free and clear of all pledges, claims, assessments, leases, charges, mortgages, liens, security interests, encumbrances, and other restrictions, to effect the assignment or novation to Buyer of all of the Equipment Leases, and to consummate the Transactions.

(xvii)  the Escrow Agreement duly executed by Seller;

(xviii)  the Administrative Service Agreement duly executed by Seller;

(xix)  the Stock Pledge and Security Agreement duly executed by Ziebart.

## ARTICLE 11

### Conduct of Seller and Buyer after Closing

11.1.  **Continuation of Operations; Further Cooperation.**  Buyer and Seller will cooperate upon and after the Closing Date in effecting the orderly transfer of the Acquired Assets from Seller to Buyer.  In addition, after the Closing Date, at the request of Buyer and at Buyer's expense, but without additional consideration to Seller, Seller shall execute and deliver to Buyer from time to time such further instruments of conveyance and transfer and take such other actions as Buyer reasonably may require to convey and deliver more effectively to Buyer the Acquired Assets, to perfect Buyer's title thereto, and otherwise to accomplish the orderly transfer to Buyer of the Acquired Assets as contemplated by this Agreement.

-32-

11.2.  <u>Non-Solicitation</u>.  As of the Closing Date, Buyer shall offer employment to, and Seller shall use its best efforts to assist Buyer in employing as new employees of Buyer, all persons presently engaged in the business conducted at the Facility, who are identified by Buyer prior to the Closing Date (the "Employees").  Seller shall terminate effective as of the Closing Date any employment it has with any of the Employees. Until the third anniversary of the Closing Date, Seller will not directly or indirectly solicit or offer employment to any Employee (i) who is then an employee of Buyer or (ii) who has terminated such employment without the consent of Buyer within 180 days of such solicitation or offer, and Buyer will not directly or indirectly solicit or offer employment to any person who, after the Closing Date is then an employee of Seller or who has terminated such employment without the consent of Seller within 180 days of such solicitation or offer.

11.3.  <u>Discharge of Business Obligations</u>.  From and after the Closing Date, Seller shall pay and discharge, in accordance with past practice but not less than on a timely basis, all obligations and liabilities incurred prior to the Closing Date in respect of the business conducted at the Facility or the Acquired Assets, its operations or the assets and properties used therein, including without limitation any liabilities or obligations to employees, trade creditors and customers of Seller.

11.4.  <u>Maintenance of Books and Records</u>.  Each of Seller and Buyer shall preserve until the third anniversary of the Closing Date all records possessed, or to be possessed by such party relating to any of the Acquired Assets, or the business conducted at the Facility prior to the Closing Date. After the Closing Date, Seller shall provide Buyer with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to (i) the officers, employees and consultants of Buyer and (ii) the books of account and records of Seller, but, in each case, only to the extent relating to the Acquired Assets or the business conducted at the Facility prior to the Closing Date, and Buyer and its representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of Seller; and further, provided, that, as to so much of such information as constitutes trade secrets or confidential business information of

-33-

Seller, and its officers, directors and representatives will use due care to not disclose such information except (i) as required by law, (ii) with the prior written consent of such party, which consent shall not be unreasonably withheld or delayed, or (iii) where such information becomes available to the public generally, or becomes generally known to competitors of such party, through sources other than the requesting party, its affiliates or its officers, directors or representatives.

11.5.   Payments Received.

(a)   Seller and Ziebart agree that after the Closing they will hold and will promptly transfer and deliver to Buyer, from time to time as and when received by either of them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash), or other property that they may receive on or after the Closing which properly belongs to Buyer, including without limitation any payment on account of shipments made by Buyer and any insurance proceeds, and will account to Buyer for all such receipts.

(b)   Buyer agrees that after the Closing it will hold and will promptly transfer and deliver to Seller or Ziebart as the case may be, from time to time as and when received by it, any cash, checks with appropriate endorsements (using its best efforts not to convert such checks into cash), or other property that it may receive on or after the Closing which properly belongs to Seller or Ziebart, including without limitation any payment on account of shipments made by Seller and any insurance proceeds, and will account to Seller or Ziebart, as the case may be, for all such receipts.

11.6.   Use of Name.   From and after the Closing Date, Seller will sign such consents and take such other action as Buyer shall reasonably request in order to permit Buyer to use the name "ZP Corporation" and variants thereof.   Prior to the Closing, Seller shall change its corporate name to a name which does not include the initials "ZP" or "ZPG" by filing all necessary or appropriate forms with the Michigan Secretary of State and any other appropriate agency or entity.   From and after the Closing Date, neither Seller nor Ziebart will use the names "ZP Corporation" or "ZPG, Inc." or any names similar thereto or variants thereof.

-34-

11.7.   <u>UCC Matters</u>.  From and after the Closing Date, Seller will promptly refer all inquiries with respect to ownership of the Acquired Assets or the operation of the Facility to Buyer.

11.8.   <u>Seller's Covenant Not to Compete</u>.  As provided in the Non-Competition Agreement, Seller and each of its affiliates agrees that for a period of fifteen years after the Closing Date, neither it nor any of its affiliates will, directly or indirectly, own, manage, operate, jointly control or participate in the ownership, management, operation or control of, any business whether in corporate, proprietorship or partnership form or otherwise as more than a ten percent owner in such business where such business is competitive with the business of the Buyer as conducted immediately following the Closing.

11.9   <u>Buyer's Covenant Not to Compete</u>.  Buyer and each of its affiliates agrees that it shall not sell, any products (i) made with a formula supplied to Buyer from Ziebart or (ii) using the Ziebart Trademark (collectively referred to as "Ziebart Products") in the automotive industry except to Ziebart, original equipment manufacturers, or other customers approved by Ziebart in advance, which approval shall not be unreasonably withheld. Buyer and each of its affiliates agrees that it shall not sell, any products directly to Ziebart or Ziebart/Tidycar franchisees or sell any Ziebart Products to competitors of Ziebart or Ziebart/Tidycar franchisees in the non automotive retail market, in any case for a period of the longer of (a) fifteen (15) years from the date of closing or (b) the period during which the License Agreement ( including any renewals thereof) is in effect.

## ARTICLE 12

### Brokerage; Expenses

Seller and Buyer each warrant to the other that except with respect to Houlihan Lokey Howard & Zukin, to which Seller has agreed to pay an investment banking fee, and First Liberty Merchant Group, to which Buyer has agreed to pay an investment banking fee, no brokerage commission or any other fees are payable to any broker, salesman, finder or consultant. Seller and Buyer each hereby indemnify, protect, defend and hold each other harmless from and against all claims, losses costs,

-35-

expenses and damages (including reasonable attorney fees), resulting from the claims of any broker, finder or other such party claiming by, through or under the acts or agreements of the indemnifying party. Except as otherwise expressly provided in this Agreement, the Parties agree to bear their respective expenses individually, each in respect of all expenses of any character incurred by it in connection with this Agreement or the transactions contemplated hereby. Notwithstanding any provision of this Agreement to the contrary, the obligations of the Parties under this Article 12 shall survive any termination of this Agreement.

## ARTICLE 13

### Taxes

13.1.   Seller shall pay any applicable Transfer Tax and other sales, documentary, use, and Transfer Taxes payable as a result of the transfer of the Acquired Assets. All other Taxes or assessments on the ownership and operation of the Acquired Assets that are payable prior to the Closing Date shall be paid by Seller, and all such Taxes payable after the Closing Date shall be paid by Buyer; provided, however, that all such Taxes shall be prorated as of the Closing Date.

13.2.   Notwithstanding the foregoing provisions of this Article 13, any Taxes on or measured by the net income of Buyer or Seller (including income and net worth Taxes), imposed or levied by or payable to any federal, state, or local taxing authority shall be paid or payable by the Party upon which such Taxes are imposed or levied.

## ARTICLE 14

### General

14.1.   Entire Agreement.   This Agreement constitutes the entire understanding among the Parties with respect to the subject matter contained herein and supersedes any prior understandings and agreements among them respecting such subject matter.

14.2.   Headings.   The headings in this Agreement are for convenience of reference only and shall not affect its interpretation.

-36-

14.3.  <u>Gender</u>.  Words of gender may be read as masculine, feminine, or neuter, as required by context.

14.4.  <u>Number</u>.  Words of number may be read as singular or plural, as required by context.

14.5.  <u>Exhibits and Schedules</u>.  Each Exhibit and Schedule referred to herein is incorporated into this Agreement by such reference.

14.6.  <u>Severability</u>.  If any provision of this Agreement is held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability will not affect any other provision hereof.  This Agreement shall, in such circumstances, be deemed modified to the extent necessary to render enforceable the provisions hereof.

14.7.  <u>Notices</u>.  All notices shall be in writing and shall be deemed to have been given if presented personally at the time of delivery and if sent by nationally recognized overnight delivery service on the day following the date sent, to the following addresses:

If to Buyer, to:

The Sentry Corporation
237 Mill Street
Darby, Pennsylvania   19023
Attention:  Ellis L. Breskman, Ph.D.

With a required copy to:

Pepper, Hamilton & Scheetz
1235 Westlakes Drive, Suite 400
Berwyn, Pennsylvania  19312
Attention:  A. John May III, Esq.

If to Seller and/or Ziebart, to:

Ziebart International Corporation
1290 Maple Road
P. O. Box 1290
Troy, Michigan  48007-1290
Attention:  Thomas E. Wolfe, CEO

-37-

With a required copy to:

May, Simpson & Strote, P.C.
100 West Long Lake Road, Suite 200
Bloomfield Hills, Michigan 48304
Attention:  Thomas C. Simpson, Esq.

Notice of any change in any such address shall also be given in the manner set forth above.  Whenever the giving of notice is required, the giving of such notice may be waived by the Party entitled to receive such notice.

   14.8.  <u>Counterparts</u>.  This Agreement may be executed in counterparts, all of which taken together will constitute one instrument.

   14.9.  <u>Waiver</u>.  The failure of any Party to insist upon strict performance of any of the terms or conditions of this Agreement will not constitute a waiver of any of its rights hereunder.

   14.10. <u>Further Actions and Assurances</u>.  The Parties shall execute and deliver such additional documents and shall cause such additional action to be taken, before, on, and after the Closing Date, as may be required, necessary or appropriate, to effect or evidence the provisions of this Agreement and the transactions contemplated hereby.

   14.11. <u>Successors and Assigns</u>.  This Agreement binds, inures to the benefit of, and is enforceable by the permitted successors and assigns of the Parties, and does not confer any rights on any other persons or entities.  None of the Parties hereto may assign any of its rights or duties under this Agreement without the written consent of the other Parties.

   14.12. <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with the substantive laws of the State of Michigan without regard to conflict or choice of law principles.

   14.13. <u>Amendments and Termination</u>.  This Agreement may be amended, supplemented, and terminated only by a written instrument duly executed by all of the Parties.

**14.14   SUBMISSION TO JURISDICTION; WAIVER OF JURY AND BOND.**   PARTIES HEREBY CONSENT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF MICHIGAN AND IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS RELATING TO THIS AGREEMENT, OR THE OTHER AGREEMENTS OR DOCUMENTS DELIVERED PURSUANT TO THE TERMS HEREOF, SHALL BE LITIGATED IN SUCH COURTS, AND EACH PARTY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON IMPROPER VENUE OR FORUM NON CONVIENS TO THE CONDUCT OF ANY PROCEEDING IN ANY SUCH COURT AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT, AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY MESSENGER DIRECTED TO IT, HIM OR HER AT THE ADDRESS SET FORTH HEREIN AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE GIVING OF SUCH NOTICE AS SET FORTH HEREIN.   THE BUYER AND SELLER ACKNOWLEDGE THAT THE TIME AND EXPENSE REQUIRED FOR TRIAL BY JURY EXCEED THE TIME AND EXPENSE REQUIRED FOR A BENCH TRIAL AND HEREBY WAIVE, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Agreement on the date first above written.

ATTEST:

THE SENTRY CORPORATION

By: _____
        President

ATTEST:

ZIEBART PRODUCTS GROUP, INC.

By: _____
        Executive Vice President

ATTEST:

ZIEBART INTERNATIONAL CORPORATION

By: _____
        President

-39-