UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Ziebart International Corp.,

           Plaintiff,      Case No. 15-cv-11745

v.                               Judith E. Levy
                               United States District Judge
Z Technologies Corp.,
                               Mag. Judge Anthony P. Patti
           Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [93] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [95]**

This case arises out of the fractured business relationship between Ziebart International, Corp. and Z Technologies, Corp. Pursuant to leave of the Court, the parties have filed a second round of summary judgment motions. For the reasons stated below, both plaintiff's and defendant's motions for summary judgment are denied.

**I.    Background**

In this case, the Court permitted the parties to engage in two rounds of summary judgment briefing. In an opinion and order dated January 23, 2017, the Court denied defendant's motion for summary

judgment, granted in part and denied in part plaintiff and third party defendant Pure Asphalt Corp.'s motion for summary judgment, and granted Pure Asphalt Corp.'s motion for judgment on the pleadings. (Dkt. 80.) In that opinion and order, the Court recounted the facts of this case, and will primarily rely on that recitation of facts here. *See Ziebart Int'l Corp. v. Z Techs. Corp.,* No. 15-CV-11745, 2017 WL 282395 (E.D. Mich. Jan. 23, 2017).

In 1996, plaintiff sold its chemical subsidiary, Ziebart Products Group, Inc. ("ZPG") to The Sentry Corporation, which then became known as Z Technologies, Inc. (Dkt. 1 at 6; Dkt. 56-2 at 8.) As part of the sale, the parties entered into the following agreements that addressed, among other things, use of trade names, trademarks, disclosure of information, and other intellectual property: Asset Purchase Agreement; License Agreement; Non-Competition and Non-Disclosure Agreement; and Supply Agreement. (Dkt. 1 at 4–6; Dkt. 52 at 19–23; Dkt. 66-10 at 2.)

The primary agreement was the Asset Purchase Agreement ("APA"). This agreement transferred all of ZPG's manufacturing equipment, property, and know-how to defendant, including the equipment and processes for manufacturing the product known as

2

Formula Q. In its exact language, it involved the sale of "all of the assets of Seller currently used by Seller at the Facility or elsewhere in connection with the business conducted at the Facility which are necessary, important or useful to the business conducted at the facility as set forth in Schedule 2.1," where "Seller" was defined as ZPG. (Dkt. 93-1 at 11-12.) Any reference to Ziebart in the APA used the name Ziebart. (*Id.* at 7.) Importantly, neither party could locate and produce Schedule 2.1 during the course of this litigation, and the parties disagree about its contents.

Pursuant to the License Agreement, defendant was permitted to license and use specified trademarks, service marks, and trade names owned by plaintiff for sale to automobile manufacturers. (Dkt. 56-4 at 3–4.) The intellectual property to be licensed to defendant was supposed to be attached to the License Agreement as Exhibit A, but neither party provided it to the Court.

The parties also entered into a Supply Agreement, which generally made defendant the exclusive manufacturer of Formula Q, among other products, for sale by plaintiff. (Dkt. 56-6 at 3.) That agreement reserved plaintiff's right to control the quality of the chemical it purchased from

3

defendant, reject shipments that did not meet its standards, and find an alternative supplier if necessary. (*Id.*)

In 2011, after the parties' business relationship had deteriorated, plaintiff learned defendant's website was potentially infringing several of plaintiff's trademarks. (Dkt. 56 at 16; Dkt. 56-16 at 7.) The parties settled this dispute in 2012, and entered into a Settlement Agreement. (Dkt. 95-2.) The Agreement prohibited defendant from using plaintiff's trademarks on its website. (*Id.*) Subsequently, in 2015, plaintiff learned defendant was using the name Ziebart in the meta tags[1] of its website. Plaintiff brings a breach of contract claim alleging that the references to its trademarks in the meta tags of defendant's website constitute a breach of the Settlement Agreement.

## II. Defendant's Motion for Summary Judgment

Defendant asks the Court to grant summary judgment on three issues. First, it seeks a determination that it purchased the trademark for Formula Q in the 1996 APA. Second, it moves the Court to affirm that since it owns the trademark for Formula Q, it cannot be subjected to

---

[1] Meta tags are words or phrases describing a web page's content and appear in the page's code, but do not appear on the page itself. The tags can be read by search engines so the web page will appear in search results.

4

liability for trademark infringement. Finally, it seeks judicial cancellation of Ziebart's 2015 application for the Formula Q trademark.

Plaintiff responds by arguing that it never sold the Formula Q trademark to defendant, and that defendant's motion is based on a misreading of the documents surrounding plaintiff's 1996 sale of ZPG to defendant.

A trademark is "any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods . . ." 15 U.S.C. § 1127. The Lanham Act protects a trademark owner from infringement, regardless of whether the trademark is registered with the Patent and Trademark Office. *Fuji Kogyo Co., Ltd. V. Pacific Bay Int'l., Inc.*, 461 F.3d 675, 682-83 (6th Cir. 2006). It does so in order to prevent customer confusion and ensure the quality of goods in the market by prohibiting infringers from "passing off a good or service as having been produced by another." *NetJets Inc. v. IntelliJet Group, LLC,* 602 F. App'x 242, 243 (6th Cir. 2015).

A "bedrock principle[] of trademark law is that trademark . . . ownership is not acquired by federal or state registration. Rather,

5

ownership rights flow only from prior appropriation and actual use in the market." *Allard Enter., Inc., v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356 (6th Cir. 1998) (quoting *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1105 (6th Cir. 1991)) (internal quotations omitted). A party establishes actual use and a right in an unregistered trademark "by demonstrating that its use of the mark was 'deliberate and continuous, not sporadic, casual, or transitory.'" *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054-55 (6th Cir. 1999) (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir. 1974)).

As a threshold matter, plaintiff has produced sufficient evidence to establish that it owned a common law trademark in the name Formula Q prior to the APA. Plaintiff's president states in a sworn declaration that plaintiff has sold Formula Q since 1984, always using plaintiff's name to denote the source of the product. (Dkt. 99-2 at 3.) Plaintiff has taken in over $50 million in sales of Formula Q and has not changed the name of the product during that time period. (*Id.*) Such use is "deliberate and continuous" and thus establishes common law rights in the mark. *See Circuit City*, 165 F.3d at 1054-55.

What is more, plaintiff's actions indicate that trademark rights from the continuous use and sale of Formula Q vested in plaintiff not ZPG. Neither ZPG nor defendant was able to sell chemicals labeled Formula Q to customers other than plaintiff without plaintiff's permission. (Dkt. 99-2 at 4; *see also* Dkt. 110-4 at 4 ("ZPG was not allowed to call Formula Q, Formula Q."); Dkt. 93-5 (License Agreement between plaintiff and defendant that included use of the Formula Q name).) During the time period in which ZPG manufactured the chemical known as Formula Q, any direct sales of the chemical it made to automakers was under the label Formula 1021. (Dkt. 100-4 at 4.) By taking these steps to ensure that Formula Q was associated with Ziebart, rather than ZPG, plaintiff assigned the trademark rights in the Formula Q name to itself and not its subsidiary.

Having established that plaintiff had a common law right in the Formula Q trademark prior to the APA, the next question is whether plaintiff sold the rights to that mark to defendant in the APA.

A court's role in interpreting a contract is to "determine what the agreement was and effectuate the intent of the parties." *Hunt v. Drielick*, 496 Mich. 366, 372 (Mich. 2014). Courts will "ascertain the intent of the

7

parties from the plain and unambiguous language of a contract." *Michigan Bell Tel. Co. v. MCIMetro Access Transmission Serv., Inc.*, 323 F.3d 348, 357 (6th Cir. 2003) (citing *Haywood v. Fowler*, 190 Mich. App. 253, 258 (Mich. Ct. App. 1991)). In doing so, "[c]ourts must construe contracts as a whole." *Id.* (internal quotations omitted). In addition, "where one writing references another instrument for additional contract terms, the two writings should be read together." *Naturipe Foods, LLC v. Siegel Egg Co.*, No. 327172, 2016 WL 4723312, at *2 (Mich. Ct. App. Sept. 8, 2016), *appeal denied,* 500 Mich. 1021 (2017) (quoting *Forge v. Smith*, 458 Mich. 198, 207 (Mich. 1998)).

Reading the APA as a whole and ascertaining its intent from the plain language of the contract, the parties could not have intended for defendant to purchase the Formula Q trademark.

Defendant points to language in the contract indicating that it purchased "all of the assets of Seller currently used by Seller at the Facility or elsewhere in connection with the business conducted at the Facility which are necessary, important or useful to the business conducted at the facility as set forth in Schedule 2.1." (Dkt. 93-1 at 11-12.) Neither party could produce Schedule 2.1 – the list of assets to be

8

transferred – during litigation, and defendant contends that the trademark would have been listed therein. (Dkt. 93 at 17.) Even so, defendant posits "[n]o reasonable trier of fact would conclude that the trademark for Formula Q, when not listed as an excluded asset, is not 'necessary, important or useful to the business' of manufacturing Formula Q . . ." Further, according to defendant, plaintiff agreed in the APA to "refrain from competing in the Formula Q market for fifteen years," and the APA "could have easily excluded the trademark, but it did not." (*Id.*) All of this, taken together, indicates that plaintiff intended to sell the trademark to defendant.

However, defendant misreads the contract, and, when given its plain meaning, the contract could not have involved a sale of the trademark from plaintiff to defendant. The APA codified a sale of plaintiff's wholly owned manufacturing subsidiary, ZPG, to defendant. (*See generally* Dkt. 93-1; 93-4.) It is clear from the plain language of the APA that it was a transfer of ZPG's manufacturing rights, know-how, and tools from plaintiff to defendant. The contract identifies ZPG, not Ziebart, as the "Seller," and defendant only bought "Seller['s]" assets. (Dkt. 93-1 at 7, 11.) Defendant could not have purchased the Formula Q

9

trademark in the APA because the seller, ZPG, did not own the trademark.

Additionally, the parties demonstrated in the APA that if they had wished to effect a transfer of all intellectual property rights in Formula Q, they knew how to do so. Section 2.1(h) of the APA lists among the "assets to be required" the "[p]atents and all specifications, processes, know-how . . . formulae, technology, trade secrets, and proprietary information relating to . . . the business conducted at the [ZPG] Facility, including . . . those items set forth in Schedule 2.1." (Dkt. 93-2 at 13.) That section then goes on to transfer "all *intellectual property rights* of Seller *and/or Ziebart* in the product developed by Ziebart known as Solvent-Based Fire-Resistant Undercoating . . ." (*Id.* (emphasis added).) In other words, the APA transferred only the enumerated set of rights, which does not include trademark rights, to products listed in schedule 2.1, while explicitly transferring "all intellectual property rights" for a different, named product. That transfer of all intellectual property rights, unlike the transfer of items in Schedule 2.1, included those possessed by plaintiff in addition to those possessed by ZPG. Accordingly, if the parties had agreed to a transfer of all intellectual property rights

10

regarding Formula Q, including those possessed by plaintiff, the APA would have said so explicitly.[2]

Further, there were exhibits attached to the APA and referenced in the language of the contract indicating plaintiff did not sell the Formula Q trademark to defendant. Where additional documents are referenced in a contract, the "writings should be read together." *See Naturipe Foods*, 2016 WL 4723312 at *2. The two exhibits relevant here are the Supply Agreement (Dkt. 93-4) and the License Agreement (Dkt. 93-5). Those two exhibits, when read in conjunction with the APA, show plaintiff selling

---

[2] In addition, throughout its briefing, defendant argues that the transfer of rights to "product formulas," "trade secrets," or "other proprietary information" must have included the trademark. However, this argument conflates a trademark with a patent. In general, trademark law "protects the goodwill represented by particular marks, enabling consumers readily to recognize products and their source and to prevent consumer confusion between products and between sources of products." 74 Am. Jur. 2d Trademarks and Tradenames § 1. In contrast, patent law relates to manufacturing, and grants a "statutory . . . monopoly that gives an inventor the exclusive right to make, use, and sell one's invention during the patent's duration, and the right to exclude all others from doing so." 60 Am. Jur. 2d Patents § 6.

Here, defendant purchased rights relating to manufacture, not rights relating to sales. Defendant became the sole owner of the recipe for Formula Q, and the APA explicitly disallowed defendant from selling products made using that recipe to anyone but plaintiff, except in certain circumstances. Plaintiff retained the right to then label and market the product as Formula Q, with the intent to identify itself as the source of the product. For this reason, among others as set forth above, the Court concludes that the trademark was not included within these terms in the APA.

its manufacturing arm to defendant, which would continue to produce products for sale by plaintiff as the sole supplier of those products. Plaintiff would then label the products with its own branding and sell them to its own customers. The Supply Agreement prohibited defendant from selling the product directly to plaintiff's customers (Dkt. 93-4 at 8 ("Z-Tech shall not . . . solicit, directly or indirectly, Ziebart or Ziebart Tidy Car franchisees product sales."), and the Licensing Agreement explicitly defined the parties' rights with regards to trademarks and branding. (Dkt. 93-5.) Specifically, it granted defendant a license to use plaintiff's trademarks in certain, limited sales in the "original equipment manufacturing automotive market." (Dkt. 93-5 at 2.)

Defendant addresses the Licensing Agreement by suggesting that it only covers the name Ziebart and "other registered trademarks . . ." (Dkt. 93 at 13.) Because Formula Q was not a registered trademark, defendant argues it was not covered by the Licensing Agreement. However, this argument relies on selective quoting of the Agreement. That same section, labeled "Recitals," serves only to acknowledge that plaintiff is "engaged in licensing" registered trademarks and that it "uses its distinctive Ziebart name and other registered trademarks,

12

tradenames, and service marks . . ." (Dkt. 93-5 at 2.) This is not the operative portion of the Agreement. Instead, the operative portion of the Agreement defines the phrase "trademarks" as "the trademarks, service marks, and tradenames" plaintiff uses, and makes no reference to whether they are registered.[3] (*Id.* at 3.) Moreover, the Licensing Agreement specifically licenses the trademarks associated with the assets included in plaintiff's sale of ZPG to defendant. (*Id.* at 2.)

Defendant's arguments ignore the effect of the Licensing Agreement. If defendant's reading of the documents in this case is correct – that the assets sold in the APA included the Formula Q trademark – then the Licensing Agreement would not have been necessary. Plaintiff, the licensor in the Licensing Agreement, could not have licensed its trademarks to defendant if it had sold them. Under such a reading, the entire Licensing Agreement is superfluous.

---

[3] This section of the Agreement references an "Exhibit A" which purported to list the trademarks at issue in the Licensing Agreement. Neither party has produced nor referenced Exhibit A in this litigation. However, that provision of the Licensing Agreement makes clear that the license applies to the "licensed goods," which the Licensing Agreement earlier defines as "any and all chemicals or products manufactured by licensee." Given that Formula Q is a "chemical or product manufactured by licensee," defendant, the section of the Agreement defining the term "trademark" applies to Formula Q. (Dkt. 93-4 at 2.)

The parties' course of dealing also indicates that defendant never purchased the Formula Q trademark. On June 14, 2000, after the parties' business relationship had ended, plaintiff sent a cease and desist letter to defendant demanding that defendant stop using plaintiff's trademarks. Specifically, the letter noted that plaintiff "has common law trademark rights in the name[] . . . 'Formula Q,'" and that defendant's use of plaintiff's trademarks "is an illegal infringement of those trademarks." (Dkt. 99-11 at 3.) Defendant responded to that letter twelve days later, stating it "has no intention of using the Ziebart trademark or Zeibart labeled products." (Dkt. 99-12 at 2.) It did not claim ownership of the trademark. (*Id.*)

In addition, throughout the parties' supply relationship, plaintiff continuously audited the quality of the products defendant supplied it, and rejected product that did not meet its quality standards. A trademark owner can abandon its rights when its actions are such that "the mark can no longer provide a meaningful assurance of quality." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 764 (6th Cir. 2005) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33 cmt. b (1995)). Plaintiff, in this case, zealously guarded the quality of Formula

14

Q that defendant produced and returned product that was not up to its standards. (Dkt. 99-15.) Such behavior is consistent with a trademark owner protecting its rights and avoiding abandonment.

For the reasons set forth above, plaintiff owned a common law right in the Formula Q trademark and never sold those rights to defendant. Thus, defendant was never the owner of the Formula Q trademark. For this reason, defendant's motion for summary judgment on its claim that it was the owner of the Formula Q mark is denied. Because summary judgment on this claim is denied, summary judgment is also denied with respect to defendant's other claims – that it cannot be subject to liability for trademark infringement and cancellation of plaintiff's trademark application – because both of those claims are premised on defendant's ownership of the trademark.

### III. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on its breach of contract claim, alleging that defendant breached the parties' 2012 Settlement Agreement by failing to remove references to Ziebart and Z-Shield from the meta tags of its website. (Dkt. 95 at 7.) Defendant contends that the term "website" in the Settlement Agreement referred only to its visible

15

website and not the underlying meta tags. (Dkt. 98 at 8-10.) The parties also disagree about the showing necessary to prove damages. Plaintiff argues that the fact that internet users searching for its products may be, instead, directed to defendant's products is sufficient to establish damages in this case. (Dkt. 95 at 8.) Defendant suggests that in order for plaintiff to succeed, it must show that someone viewed the meta tags on defendant's website and then purchased defendant's product. (Dkt. 98 at 11.)

Under Michigan law, a party alleging breach of contract must demonstrate "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 178 (Mich. 2014). When conducting this analysis, courts "determine what the agreement was and effectuate the intent of the parties." *Hunt*, 496 Mich. at 372. Courts will "ascertain the intent of the parties from the plain and unambiguous language of a contract." *Michigan Bell Tel. Co.* 323 F.3d at 357. But, when the contract's "words may reasonably be understood in different ways," the terms are ambiguous and the intent of the parties is a question left to the jury. *Leonor v. Provident Life and Acc. Co.*, 790 F.3d 682, 687

(6th Cir. 2015) (citing *Raska v. Farm Bureau Mut. Ins. Co. of Michigan*, 412 Mich. 355, 361-62 (Mich. 1982)). "Whether a contract's terms are ambiguous is a question of law for the court to decide." *Scott v. State Farm Fire and Cas. Co.*, 86 F. Supp. 3d 727, 733 (E.D. Mich. 2015) (citing *Whitehouse Condo. Grp., LLC v. Cincinnati Ins. Co.*, 569 F. App'x 413, 416 (6th Cir. 2014)).

Here, the parties disagree over the meaning of the term "website" in the 2012 Settlement Agreement. Plaintiff contends that "website" includes all parts of the website, including the meta tags not part of the visible portion of the site. (Dkt. 95 at 7.) Defendant, on the other hand, argues that "website" was only intended to cover the portions of the site visible to the public. (Dkt. 98 at 8-10.)

Both Plaintiff's and defendant's president (and signer of the Settlement Agreement) testified to their respective company's position about the meaning of the term "website." (Dkt. 98-6 at 5-6; Dkt. 98-7 at 4-5.) Thomas Wolfe, president of Ziebart, testified "we intended this agreement to cover anything on a website. So meta tags would have been part of a website, the backup." (Dkt. 98-6 at 6.) In contrast, Louis Breskman, president of Z Technologies, testified that it removed visible

references to plaintiff's trademarks from the website, "and since Ziebart agreed that the references they . . . wanted removed were removed, a settlement agreement was enacted." (Dkt. 98-7 at 5.) In addition, the settlement agreement does not define any of the terms that it uses, including website.

Because the term website "may reasonably be understood in different ways," and the parties did understand it in different ways, the language of the settlement agreement is ambiguous. *See Leonor* 790 F.3d at 687. Thus, summary judgment on the question of whether defendant breached the contract when it left plaintiff's trademarks in its meta tags is denied, and the question of what the term "website" in the settlement agreement means must be answered by the jury.

The Court does not reach the parties' arguments about whether plaintiff suffered damages from an alleged breach because the Court cannot say whether defendant breached the agreement as a matter of law.

Accordingly, plaintiff's motion is denied.

## IV. Conclusion

For the reasons set forth above, each party's motion for summary judgment is denied.

IT IS SO ORDERED.

Dated: March 13, 2018　　　　　　　s/Judith E. Levy
Ann Arbor, Michigan　　　　　　　　JUDITH E. LEVY
　　　　　　　　　　　　　　　　　United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 13, 2018.

　　　　　　　　　　　　　　　　s/Shawna Burns
　　　　　　　　　　　　　　　　SHAWNA BURNS
　　　　　　　　　　　　　　　　Case Manager